502 So.2d 543 (1986)
STATE of Louisiana
v.
Michael Owen PERRY.
No. 86 KA 0460.
Supreme Court of Louisiana.
November 24, 1986.
Rehearing Denied March 12, 1987.
*545 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Rene Solomon, Steve Laiche, Asst. Attys. Gen., for plaintiff-appellee.
Robert Mark Romero, Welsh, Richard Arceneaux, Jennings, for defendant-appellant.
COLE, Justice[*].
Michael Owen Perry was indicted on five counts of first degree murder, in violation of La.R.S. 14:30. After deliberation during the guilt phase of his trial, the twelve person jury unanimously concluded defendant was guilty as charged on all five counts.
Following the presentation of evidence during the sentencing portion of the trial, the jury unanimously recommended defendant be sentenced to death on each count. The jury found the same two aggravating circumstances existed for each crime: the offender knowingly created a risk of death or great bodily harm to more than one person; and the offense was committed in an especially heinous, atrocious, or cruel manner. The trial judge subsequently imposed the death sentence.
Defendant on appeal relies on six assignments of error. The first three assignments of error concern statements made by defendant to various persons which the trial court ruled were admissible. Assignment of Error Number One contends the trial court erred in allowing the introduction of a statement given to Deputy Herbert L. Durkes, Jr. on September 15, 1983, while defendant was incarcerated at the Jefferson Davis Parish jail. In Assignment of Error Number Two, defendant argues the trial court should not have permitted the introduction of the testimony of his aunt, Zula Lyon, regarding statements defendant made to her. Assignment of Error Number Three involves the introduction of testimony of Deputy Ervin Trahan as it relates to a statement made by defendant while being transported by Trahan and Sheriff Dallas Cormier to the Feliciana Forensic Facility for psychiatric evaluation.
Defendant in the Fourth Assignment of Error complains of the admission into evidence of the objects seized at the two crime scenes, arguing their admission violates his Fourth Amendment right to be protected from warrantless searches and seizures. In Assignment of Error Number Five, defendant alleges the trial court erred in allowing the State to introduce numerous color photographs of the five homicide victims. The final assignment of error contends the trial judge erred in failing to grant defendant's motion for a mistrial following a state witness's reference to defendant's theft of a radio.
*546 We have added two issues not specifically addressed by counsel in brief to ensure full review, noting they were raised during oral argument. These issues are the finding of the sanity commission hearings and defendant's withdrawal of the dual plea of "not guilty and not guilty by reason of insanity."
We therefore treat in this opinion the six assignments of error, the additional issues, and we also review the sentence. Because we find no error in the trial court proceedings and find the conviction and sentence to be valid under the law, we affirm.

FACTS
The victims in this case were all related to defendant: two were his cousins, Randy Perry and Bryan LeBlanc; two were his parents, Grace and Chester Perry; and the fifth victim was defendant's two-year-old nephew, Anthony Bonin. They were shot in separate households located only two doors away from each other. The cousins died first in the residence located at 639 Louisiana Street in Lake Arthur, Louisiana. Defendant's parents and nephew died next, inside the Perry's home at 810 Seventh Street. The circumstantial evidence from which these facts were derived was presented by the prosecution through the testimony of a number of witnesses. Other information was obtained from a statement defendant gave to Deputy Herbert Durkes while defendant was incarcerated.
On July 17, 1983 defendant apparently entered the unlocked house on Louisiana Street in the early morning. He walked first to the living room couch where Randy Perry lay asleep. From a short distance of only a few feet, he fired into the left eye of his cousin. The accused then entered the bedroom where Bryan LeBlanc slept, and again fired the gun at the victim's head.
It appears defendant then walked across the yard to his parents' home at 810 Seventh Street and broke into the house. He listened to music for a while, awaiting his parents' arrival home from an out of town trip. His parents, on their return home, stopped to pick up the two-year-old, Anthony Bonin, whom they cared for when his father worked offshore.
At about the time the parents arrived home, several people in the vicinity heard loud noises or gunshots. In the statement defendant gave to Deputy Durkes admitting to the five murders, defendant indicated his father came through the door first, followed by the child and the mother. According to this statement, he shot his father first, then his mother, and then the child. There appeared to be some struggle with his father, whose body was found crouching behind the television in the living room. Because his first attempt did not kill either of his parents, he shot both of them a second time in the head. Not being sure the child was dead, he shot him a second time also. After dragging his mother's body away from the door so he could close it, he took his father's billfold containing $3,000 cash, and a strongbox belonging to his mother. He left the scene in his father's car.
The caretaker of the 639 Louisiana Street residence, Ernest Ashford, discovered the bodies of Randy Perry and Bryan LeBlanc shortly after 5:00 P.M. on July 19, 1983. The caretaker was the son-in-law of the owner of the house and the stepfather of Bryan LeBlanc. Ashford had a key to the house, and had entered the house out of concern for the diabetic Perry. Ashford notified police, who later entered the residence of Grace and Chester Perry and discovered the bodies of the other three victims.
Defendant became a suspect because of the bad relationship he had with his parents. Defendant lived in a trailer behind their home and was not allowed to enter their home without their permission. Zula Lyon, defendant's aunt, testified in the guilt phase of the trial that defendant's motive for the killings was to obtain insurance proceeds from his parents' policies. Another possible motive was the fact defendant's parents had taken him to a mental hospital in Galveston for examination when he was sixteen and had him committed to the Central State Hospital at Pineville *547 two years later. According to testimony, he was infuriated at his parents for committing him and had consequently threatened to kill them. Interrogated as to why he killed the victims, Deputy Durkes gave this account of defendant's statement:
Why did you kill all those people? The boys threw me out of my grandmother's house, stole money from me all the time, and harassed me constantly. My mother and father wouldn't leave me alone. They made me live in that little trailer behind their house by all those stinking dog pens. They took all my money all the time, wouldn't let me in their house when I wanted. I just couldn't take it anymore.
I asked him why he killed the child. The kid was evil, some sort of devil, witch of some sort. I askedI'm sorry. I said that the child was too young to do him any harm or even talk, so why kill him? He was a very smart kid, he said, too smart for his age. I had to make sure he was dead.
Defendant arrived in Washington, D.C. on July 18, 1983, the day after the murders were committed. He checked into the Annex Hotel. While there, he paid rent in advance for his room, giving the clerk five one hundred dollar bills. He also bought numerous items from a television store, which were loaded by a clerk into a car matching the description of that owned by his father. On July 31, 1983 defendant had an encounter with another guest at the Annex Hotel which led to the police being called. An officer ran a routine check on defendant and learned he was wanted in Louisiana for five counts of homicide. At the time of his arrest he had in his possession $1,100 cash and a hotel key. Following his arrest, the Washington police obtained a search warrant for his hotel room. Among the evidence recovered was one of the recently purchased television sets, with the names of the five victims written on the side. The vehicle driven by Chester and Grace Perry on their trip was recovered approximately one week later in a Washington, D.C. police impoundment lot where it had been towed for being parked in a no parking zone.
Following his transport back to Louisiana defendant was indicted on five counts of first degree murder. Defendant initially entered the dual plea of "not guilty and not guilty by reason of insanity" to each charge. A sanity hearing was held to determine his competency to stand trial, and the judge ordered he be sent to Feliciana Forensic Facility for further psychiatric evaluation. Subsequent to his return from this evaluation, another sanity hearing was held. At the close of this hearing defendant was allowed to withdraw his dual plea and enter the single plea of "not guilty," against the advice of counsel.
The issue of defendant's sanity is material to assignment of errors one and three, and is also relevant in the determination of whether or not defendant should have been permitted to withdraw the dual plea initially entered and replace it with a plea of "not guilty." Even though not included in the assignment of errors, we address the finding of the sanity commission hearings and the withdrawal of the dual plea because of their overall importance and effect on other assigned errors, and because we deem it imperative to afford a defendant assessed the death penalty a review of all issues raised in his behalf regardless of whether formally asserted.

DETERMINATION OF COMPETENCY
Defendant was the subject of two sanity commission hearings, the first on September 26, 1983 and the second on March 1, 1985. The first commission was composed of Dr. Louis E. Shirley, Jr., a general practitioner with some capacity to treat psychiatric disorders, and Dr. Young Hee Kang, a general practitioner who completed a residency in psychiatry. After brief interviews with the defendant in the parish jail on September 26, 1983, both were of the opinion he needed further psychiatric evaluation. They summarized their findings:
We find that he has a long history of paranoid schizophrenia and at this time is not in complete contact with reality and *548 may be dangerous to himself and others. We were not able to ascertain his mental state at the time of the alleged offense(s). We feel that he needs complete psychiatric evaluation and therapy at this time.
As a result of this hearing the defendant was sent to the Feliciana Forensic Facility, for evaluation and treatment. The record does not reflect when the defendant was returned to Jefferson Davis Parish, but defendant was apparently returned in March of 1984.
Upon motion of the State, the second sanity commission was appointed. This commission was composed of the same two physicians who were on the first commission, plus an additional physician who specializes in psychiatry, Dr. Aretta J. Rathmell.
At this second commission hearing, the three physicians unanimously agreed defendant was mentally competent and could assist his counsel in his defense. The trial court agreed, finding the evidence clear, and ruled accordingly.
It is fundamental to our adversary system of justice that a defendant who lacks the capacity to understand the proceedings against him or to assist counsel in preparing a defense may not be subjected to trial. La.C.Cr.P. art. 641; Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). This Court in State v. Bennett, 345 So.2d 1129 (La.1977), set forth the appropriate considerations which a trial judge must use in the determination of competency:
Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. Bennett, supra, at 1138.
It appears the examining physicians and court abided by these criteria. Dr. Rathmell, the psychiatrist, and the first of the three doctors on the commission to testify at the second sanity commission hearing, in particular paid attention to the criteria. She read from her report, which followed almost verbatim the factors set forth in Bennett, and concluded defendant was presently sane and able to proceed with trial. Her opinion was based on two ninety minute interviews with defendant, and evaluation of medical reports from the two State hospitals to which defendant had been committed. Some of these reports came from Feliciana Forensic Facility, and were the result of months of observation. She noted the records compiled by the psychiatrists at Central State Hospital at Pineville diagnosed the accused as having a paranoid illness, which she indicated is more of a character trait or state of mind than is the more serious schizophrenic illness. She characterized schizophrenia as a more incapacitating thinking disorder. She believed defendant has periodically had severe psychiatric problems, but agreed with the earlier psychiatric diagnoses from Central State Hospital. She found at the time of defendant's examination by her he was in remission of a paranoid illness. Though on cross-examination Dr. Rathmell admitted *549 other hospital records characterized the defendant as having paranoid schizophrenia, she noted those words always appeared with the signature of non-medical personnel. Dr. Rathmell noted no psychiatrist had ever documented the diagnosis of acute paranoid schizophrenia.
Dr. Shirley did not include in his opinion of defendant's mental condition as many of the criteria from Bennett as did Dr. Rathmell. However, he still addressed several of them in his testimony during examination. Dr. Shirley was firm in his conclusion the defendant seemed to be able to assist his counsel at trial, to be aware of the charges against him, and to be able to help in his defense. Dr. Kang, like Dr. Shirley, also did not include all of the criteria, but was of the opinion he could assist his counsel, understand the trial he was facing, and understand the consequences of possible conviction.
It should be noted additional support for the finding of competency is evident in the testimony of Dr. Theresa Jiminez, who testified during the penalty phase of defendant's trial. Dr. Jiminez is a certified psychiatrist, and was employed as clinical director at Feliciana Forensic Facility during the time defendant was being evaluated there under court order. Her duties included determining whether or not patients were mentally ill. She testified there are two types of mental illnesses: schizophrenia, which is a major mental illness, and those illnesses that constitute personality disorders. She classified defendant as having a personality disorder, of an anti-social type. She also indicated defendant is smart enough to act in a crazy manner if he feels he needs to do so. Further, she stated if a person is suffering acutely from a major mental illness, as opposed to a personality disorder, he would not have the capacity to plan and reason out his acts as was necessary for the crimes involved here. He would not be able to think logically, lay in wait for someone to come home, plan a murder, hide evidence, or know to flee from town.
A comparison of the length of examinations and credentials of Drs. Rathmell and Jiminez, as opposed to Drs. Shirley and Kang, is significant in weighing the opinions of each as to credibility. Drs. Shirley and Kang had both earlier diagnosed defendant as being paranoid schizophrenic. Dr. Rathmell spent approximately three times as long with defendant as did Drs. Shirley and Kang; Dr. Jiminez had the benefit of months of her own personal observation and reports of other staffers while the accused was a patient from October 1983 to March 1984. Both Drs. Rathmell and Jiminez are psychiatrists; neither Dr. Shirley or Dr. Kang is a psychiatrist. Dr. Shirley himself, during his testimony, indicated a willingness to defer to the greater experience and expertise of Dr. Rathmell.
The defendant has the burden of establishing incapacity, because Louisiana law presumes the defendant is sane and responsible for his actions. La.R.S. 15:432. The defense must prove by a clear preponderance of the evidence the defendant is incompetent to stand trial as a result of a mental disease or defect. La.C.Cr.P. art. 641; State v. Machon, 410 So.2d 1065 (La. 1982). While a court is permitted to receive the aid of expert medical testimony on the issue, the ultimate decision of competency is the court's alone. La.C.Cr.P. art. 647; State v. Rogers, 419 So.2d 840 (La.1982). A trial court's determination of the mental capacity of a defendant is entitled to great weight, and his ruling will not be disturbed in the absence of manifest error. State v. Morris, 340 So.2d 195 (La. 1976).
The weight of the evidence supports the trial court's determination of competency. The expert witnesses in the sanity commission hearing at which competency was found were examined thoroughly by both prosecution and defense. The three examining physicians were unanimous in their conclusion the defendant was able to proceed with trial. It is true there were some diagnoses of defendant as having paranoid schizophrenia, made by non-psychiatrists. *550 However, the weight of the evidence, in terms of both the duration of the interviews and expertise, supports the finding of either a personality disorder or paranoid illness, as opposed to the more disabling thinking disorder of schizophrenia. In light of this evaluation of expert testimony, we cannot find the trial court's determination of defendant's competency to be clearly erroneous.

WITHDRAWAL OF DUAL PLEA
The issue of withdrawal by defendant of the dual plea was considered by the trial judge immediately following the sanity hearing. Though the change of plea was not included in the assignment of errors, we address this issue because of its importance in assuring complete review and because it was raised during oral argument.
During the interval between the appointment of the second sanity commission and the hearing on March 1, 1985, the trial court received correspondence from the defendant. In this correspondence the defendant informed the court of his desire to withdraw his dual plea of "not guilty and not guilty by reason of insanity" and enter the single plea of "not guilty." The attorneys were notified of defendant's wish and of the court's intention to consider this request if the defendant was found mentally competent at the sanity hearing.
Following the finding of competency, the defendant was informed the court was aware of his desire to withdraw his dual plea on all five counts and replace it with the single plea. He told the court emphatically he wanted to change the plea. The trial judge questioned the defendant about his education, learning he had completed 13 college hours of credit in general studies. The judge clarified and explained thoroughly what the plea of "not guilty and not guilty by reason of insanity" meant. Defendant related he and his attorneys had spoken at length about the change in plea, and in response to the judge's question, he again expressed his desire to withdraw the dual plea. Out of an abundance of caution, the judge called a recess for the express purpose of providing defendant a final consultation with his attorneys, and specifically instructed defendant to listen to his attorneys. After a forty minute recess, the defendant had not changed his mind and still wanted to change his plea. Over the objection of his counsel, the court permitted defendant to withdraw his dual plea and enter a plea of "not guilty," relying on the holding of State v. Clark, 305 So.2d 457 (La.1974). The relevant portion of Clark, supra, provides as follows:
This Court cannot approve the trial court's action in requiring the defendant to maintain such an untenable position when he desires to withdraw the insanity portion of the dual plea unless there is some overriding rationale for refusing a defense request to withdraw such a plea. The reason for La.C.Cr.P. art. 561's specific time limits within which a defendant may of right change a simple "not guilty" plea to the dual insanity plea is to give the State adequate notice of defendant's intention to advance the insanity defense and adequate time to prepare in the face of such a defense. See Official Revision Comment to La.C.Cr.P. art. 561. No such rationale is applicable in the reverse situation. When defendant seeks to withdraw the insanity portion of a dual plea and stand on a simple "not guilty" plea, no prejudice to the prosecution results. However, denial of a request for permission to withdraw the dual plea results in substantial prejudice to the defendant in a criminal prosecution. The defendant may withdraw the dual plea and substitute the single plea of "not guilty" at any time prior to the presentment of the indictment and defendant's responsive plea to the jury. Clark, at 463.
It is true the instant case is distinguishable from Clark, as it does not appear in Clark the plea was withdrawn over counsel's objection. However, this Court has recently dealt with this specific issue in the capital case of State v. Lowenfield, 495 So.2d 1245 (La.1985), where the accused *551 also wished to withdraw his plea of insanity against his attorney's advice. The Court stated the following:
It appears beyond argument that when a competent defendant wishes to plead not guilty rather than not guilty by reason of insanity, and clearly understands the consequences of his choice, then the counsel must acquiesce to the wishes of his competent client. The court had no choice but to allow the defendant to withdraw his pleas and in this we find no error.... Lowenfield, at p. 1252.
We consequently find the trial court ruling permitting defendant to withdraw his plea is correct.

ASSIGNMENT OF ERROR NO. ONE
Defendant's first assignment of error challenges the admissibility of a statement he made on September 15, 1983 to Herbert L. Durkes, Jr., a jailer at the Jefferson Davis Parish jail during the time defendant was incarcerated there. Defendant argues primarily his mental state at that time prevented him from giving a free and voluntary statement.
In the early morning hours of September 15, 1983, defendant informed Durkes he wanted to confess. Durkes told defendant he would call Detective Ervin Trahan or Chief Deputy Ted Gary to hear his confession, but defendant said he did not want to talk to them because they did not want to listen to him. Durkes therefore secured the presence of Robert Lee, the other jailer on duty, and of Daniel Peer, a trustee. Peer stood out of defendant's line of vision, along the wall beside the door to defendant's cell. Durkes and Lee squatted down so they could listen at the opening in the steel cell door through which food is placed into the cell. From that position they could see defendant's face and shoulders. Durkes read defendant his Miranda rights and asked if he understood them, to which defendant responded yes. He asked defendant if he wanted a lawyer present and defendant said he did not. Durkes listened as defendant confessed and subsequently went to his desk and wrote down the account. Lee and Peer read the written statement and agreed it matched what defendant had said. Durkes took the handwritten statement to a typist who then typed it.
Before the State can introduce what purports to be a confession, it must affirmatively show it was made freely and voluntarily, and not under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La.R.S. 15:451. In addition, if the statement was made during custodial interrogation, the State bears the burden of showing defendant received and waived his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Nelson, 459 So.2d 510 (La.1984).
At both the hearing on the motion to suppress and at trial, Durkes indicated he did not promise anything to defendant, did not threaten or intimidate him, coerce him or place any physical or mental duress upon him. Durkes described defendant as alert during the giving of the statement and stated he had defendant's full attention. Defendant made eye contact with Durkes and was responsive.
Furthermore, the record clearly demonstrates Durkes read defendant his Miranda rights and defendant does not contend otherwise. Rather, defendant's attack on the admission of the confession focuses upon whether the statement was freely and voluntarily made, considering his mental condition at the time he gave it. He relies heavily on his having been diagnosed as paranoid schizophrenic a short time before giving the statement and was soon to be sent to Feliciana Forensic Facility. In order to assess the merit of this argument, it is necessary to review the testimony from the September 26, 1983 sanity commission hearing held shortly after the statement was given, as well as from the August 21, 1985 hearing on the motion to suppress where the statement was ruled admissible.
As earlier indicated, on September 26, 1983, Drs. Shirley and Kang examined defendant and testified at a sanity hearing *552 held that same day. They concluded he was paranoid schizophrenic, and we have previously disregarded this finding in favor of the diagnoses provided by the more experienced psychiatrists. However, while defendant contends the characterization of paranoid schizophrenia by Drs. Shirley and Kang should result in his statement being excluded, we find much in their testimony which supports a finding it was made freely and voluntarily.
Dr. Shirley stated he found defendant well-oriented to time and place, and very up-to-date on current events. The doctor characterized him as very aware of what was going on around him, but determined defendant did have some "flights of fancy" during the examination in which he lost contact with reality. These "flights of fancy" did not occur all the time and resulted when certain subjects were brought up by the use of trigger words.[1]
Dr. Kang, in her testimony, concurred in Dr. Shirley's finding of defendant's "flights of fancy" being triggered by certain topics. They both felt further evaluation was necessary, and neither could ascertain what his mental state was at the time the offense was committed due to defendant's lack of recall of that time period.
Both doctors also testified at the hearing on the motion to suppress held on August 21, 1985. They reiterated their earlier testimony concerning defendant's "flights of fancy" being triggered by certain words or subjects. Dr. Shirley also stated a person with paranoid schizophrenia would be in touch with reality much of the time. Dr. Kang supported this by stating defendant was "more or less" cognizant of what was going on around him until the trigger words were mentioned.
Defendant relies upon State v. Glover, 343 So.2d 118 (La.1977), for his contention that defendant's mental state precluded his confession from being free and voluntary. In Glover, supra, this Court ruled statements made by the defendant inadmissible because at the time he gave them it was probable he was actively psychotic and legally insane. It is true the defendant in Glover, like the defendant in this case, had been diagnosed as a paranoid schizophrenic. However, it should be noted Glover also was mentally retarded and suffered from organic brain damage.
Even were we to accept the characterization of the instant defendant as being paranoid schizophrenic, this should not automatically render his statements inadmissible. In State v. West, 408 So.2d 1302 (La.1982), this Court rejected defendant's argument that his paranoid schizophrenia made it impossible for him to give a voluntary statement, and ruled the admission of the challenged statements into evidence was not erroneous. The Court distinguished West's condition from that of Glover, noting in particular Glover's organic brain damage in addition to his mental illness, as well as the fact Glover received a very potent anti-psychotic drug.
Defendant in this case appears to be more like West than Glover. He was not being medicated before he made the statement. There is no evidence he suffers from organic brain damage or is mentally retarded. To the contrary, when the trial judge questioned him in court to determine his understanding of the plea withdrawal issue, it was learned defendant had completed thirteen hours of college studies and left school because he fell behind. Drs. Shirley and Kang both stated defendant seemed in contact with reality until he heard the trigger words, and these words were not a part of the conversation between defendant and Durkes. The statement *553 given does not indicate rambling or jumping from subject to subject. Durkes testified defendant was alert, responsive, made eye contact, and gave Durkes his full attention during the giving of the statement.
The determination of the admissibility of a confession is a question for the trial judge, and his conclusion will not be disturbed unless not supported by the record as a whole. State v. Nuccio, 454 So.2d 93 (La.1984). We conclude the trial judge did not err in ruling the statement was admissible. The evidence supports his finding defendant did not suffer from mental illness to the degree necessary to result in exclusion because of involuntariness. Thus, we find no merit in this assignment of error.

ASSIGNMENT OF ERROR NO. TWO
In this assignment of error defendant alleges the trial court erred in allowing the State to introduce the testimony of Zula Lyon regarding statements defendant made to her. He contends Mrs. Lyon served as an agent for the sheriff's office and, as such, Miranda warnings should have been given. Zula Lyon is the defendant's aunt and his mother's sister.
The statements complained of were given on two of the ten to twelve occasions defendant was visited by Mrs. Lyon in 1983. On September 16, 1983, he told his aunt he remembered the murders and had killed five people. He wrote the victims' names down on a piece of paper he had in his cell. He also told her his father had $3,000 in his wallet, which he took. He related he used pistols and shotguns to kill the victims, and disposed of the weapons and some luggage in a canal.
On September 30, 1983, as Mrs. Lyon was preparing to leave after a visit with defendant, he again told her he killed the people. He added the judge did not want him to plead guilty because the case was too serious. He said he was guilty and repeated he had killed the people.
It is evident from Mrs. Lyon's testimony she had motives in visiting defendant other than to solicit information for the sheriff. While she admitted she had asked defendant questions about the murders on some of her visits, she specifically stated she had not questioned him on September 16, 1983. The purpose of her visit on that date was to bring winter clothing to defendant in preparation for his transfer to the Feliciana Forensic Facility. She also expressly stated she had never been asked to question defendant.
Similarly, the reason for her visit on September 30, 1983 was to visit him one more time before defendant left for Feliciana Forensic Facility, to see what his state of mind was and to see if he was in need of anything. It is clear Mrs. Lyon did not question him on that date. According to her testimony, the statement on that date was volunteered by defendant as Mrs. Lyon was getting ready to leave.
Defendant alleges Mrs. Lyon received special treatment from the sheriff's office, implying this would not have been the case had she not been eliciting information with the intention of relaying it to the sheriff. While it is true on some of her visits to defendant Mrs. Lyon talked with him in the sheriff's office, her testimony also makes it clear she did on some occasions see him in his jail cell in solitary confinement. Also, although she admitted she talked with the deputies a number of times about the case, she maintained they never asked her what defendant had said to her.
From Mrs. Lyon's testimony, it does not appear she was acting on behalf of the sheriff's office when she visited defendant and talked with him about the crimes. In particular, it should be noted neither statement was the result of questioning by her and both statements were instead unsolicited, spontaneous confessions of guilt.
This Court has previously considered a similar situation in State v. Loyd, 425 So.2d 710 (La.1982). Loyd was given his Miranda rights and the defendant made incriminating statements after invoking his right to silence. These statements were elicited by defendant's mother who had *554 been called by a deputy for the express purpose of obtaining information from the defendant. She spoke with him once, did not receive adequate information, and later in the morning sought permission to talk with him again. The sheriff consented and asked her to try to extract information regarding the whereabouts of the missing child. After she talked with her son, a family friend also talked with him. Then defendant's mother had another conversation with him. Before this conversation the sheriff requested that she ask her son if he would talk with the deputies.
Loyd challenged the admissibility of incriminating statements made to his mother, asserting they were not admissible because they came after he had exercised his right to cut off questioning. The Court held otherwise, reasoning the questioning by defendant's mother occurred out of the officers' presence. It noted police efforts to elicit incriminating statements from him did not constitute custodial interrogation within the meaning of Miranda, unless a person realizes he is dealing with the police. The Court specifically stated the mother "was not a police officer or agent...." Loyd at 717. The Court continued with the following:
Consequently, in the absence of any interplay between police custody and police interrogation, the mere fact that the defendant was in custody was not so intimidating, nor his mother's questioning so menacing, as to bring Miranda into play. Loyd at 717.
The Court in Loyd relied on its earlier decision in State v. Rebstock, 418 So.2d 1306 (La.1982), where the sixteen-year-old charged with commission of the crime challenged the admissibility of an inculpatory statement made to his father before being advised of his Miranda rights. The Court ruled the statement was admissible, despite the argument by defendant the father acted as an agent of the police and thus violated his constitutional rights. The Court said the father voluntarily undertook to question his son, and their brief conversation was not an extension of police interrogation. It noted the compulsion conceptualized in Miranda as resulting from interrogation was not present. Finding the defendant and his father had a short private conversation, out of the presence of the police, the Court ruled the defendant was not subjected to interrogation as defined in Miranda.
After reviewing the circumstances under which the statements were given and the applicable case law, we find no error in their admission by the lower court. This is especially required after comparing the instant situation to the more compelling facts in Loyd, in which this Court refused to exclude the statements given by the defendant to his mother. We find Mrs. Lyon was not acting as an agent for the sheriff. She did not question him on the two dates he gave the unsolicited confessions. Both statements were made when no police were present, so they were not the product of custodial interrogations. We particularly note the first of the statements came the day after defendant had confessed to Durkes. Apparently defendant was simply ready to confess. We accordingly find no merit in this assignment.

ASSIGNMENT OF ERROR NO. THREE
Defendant complains in his third assignment of error of yet another statement admitted into evidence against him. He made this statement while enroute to the Feliciana Forensic Facility.
Sheriff Dallas Cormier and Deputy Ervin Trahan transported defendant on this trip. Sheriff Cormier had invited defendant's counsel to accompany them, but counsel declined stating he was too busy. While enroute, defendant began spontaneously talking about the case. Neither the sheriff nor deputy questioned defendant or initiated conversation about the five counts against him. Rather Sheriff Cormier told defendant not to say anything because they did not want to talk about the case without his attorney present. Defendant nevertheless continued, on his own volition, to talk. Several times he asked Deputy Trahan if they had found the guns used in the homicides. *555 Trahan eventually replied they had not. Defendant then explained where the weapons could be found. During the trip defendant also spoke about his family members who had been killed, and wondered about the judge handling the case, inquiring as to whether he had sentenced anyone to the electric chair.
Defendant contends the statement regarding the location of the guns should not be admissible because the doctors had already diagnosed him as paranoid schizophrenic, referring the Court to his first assignment of error. As discussed above, we have earlier disregarded this testimony. However, even were we to agree with this medical conclusion, the diagnosing doctors testified defendant lost contact with reality when the trigger words, Olivia Newton-John, were used. Otherwise, defendant remained in contact with reality. We note Deputy Trahan testified those trigger words were not brought up during the trip to Feliciana.
Nonetheless, the circumstances in which this statement was given differ from those of the statement challenged in the earlier assignment of error. Both the sheriff and deputy testified defendant talked throughout the entirety of the trip, and said he changed subjects frequently. This might suggest defendant's mental state was less stable than it was when he spoke with Durkes. However, in rebuttal to that possible conclusion is the fact defendant always returned to and primarily wanted to talk about the subject of the murders. He also did not change topics to the extent he would change them in mid-sentence. Sheriff Cormier testified defendant was awake and remained alert during the trip. These facts indicate to us defendant was in contact with reality during the trip and wanted to convey the information regarding the location of the guns to the sheriff and deputy. Moreover, the accuracy of the statements was borne out when the police recovered the guns from the drainage canal defendant had suggested they search. As the State argues in brief, this shows defendant was in touch with reality when he made the statements. We find the trial judge correct in ruling the statement should not be excluded because of defendant's mental condition.
Defendant raises another objection to the admissibility of this statement, relying on La.R.S. 15:450. He argues the statement should not be admitted because it was only part of the conversation which took place during the trip to the Feliciana Forensic Facility. La.R.S. 15:450 mandates the following:
Every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford.
In brief defendant objects in particular on the ground that admitting only part of the confession prevented him from showing the true state of defendant's mind, how defendant changed from topic to topic during the course of his statement and how defendant was or was not in touch with reality. He contends the only portion of the statement admitted was that part beneficial to the prosecution.
A reading of the transcript reveals defense counsel did not object to the statement on the basis of La.R.S. 15:450 during direct examination. It was not until defense counsel had cross-examined Deputy Trahan rather extensively that he objected. Under these circumstances, it appears objection came too late.
Furthermore, both defense counsel and the prosecution questioned Deputy Trahan thoroughly about defendant's conversation and did elicit information in addition to that concerning the location of the guns. Trahan indicated defendant "rattled on" about a number of subjects, including whether the trial judge had ever sent anyone to the electric chair and the fact he had thrown a strong box containing a check over a bridge while going to Baton Rouge.
Finally, even if the whole statement was not admitted into evidence, this Court has *556 treated a similar situation in State v. Marmillion, 339 So.2d 788 (La.1976). It found the following:
Nevertheless, in the absence of proof to the contrary, the fact that the purported statement of the accused as testified to by the investigating officer does not consist of a verbatim reiteration of the conversation between them, due to the witness' inability to recall or other valid explanation, the rights of the accused under Section 450 are not violated. The law does not require the production of nonexistent portions of the confession or portions which cannot be recalled. Marmillion, supra, at 793.
We find this assignment seeking exclusion of defendant's statement during transport to be without merit.

ASSIGNMENT OF ERROR NO. FOUR
The defendant seeks by this assigned error to suppress all evidence seized at the two murder scenes on the day or days following discovery of the bodies. He contends the admission of this crime scene evidence violates his right and the public's right to be protected from warrantless searches and seizures.
There is no dispute the officers had a right to make warrantless entries of the two murder scenes on the reasonable belief persons within might be in need of immediate aid, to see if there were other victims and to determine if the perpetrator of the crimes was still on the premises. Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The sheriff's office secured both crime scenes until the next day and re-entered on July 20, 1983 to conduct an investigatory search, collecting evidence and removing items which required laboratory analysis. These subsequent searches of the murder scenes were warrantless although, as the State concedes, there was time to obtain a search warrant for the murder scenes. In fact a warrant was obtained to enter and search the trailer which the defendant occupied. Defendant had a privacy and proprietary interest in his deceased parent's house, he argues. Moreover, defendant argues the public has an interest in preventing the admission of evidence from an illegal search. (The argument of the public's right against warrantless search and seizure was raised in brief and oral argument, but no authority was given.)
Defendant relies upon Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984), which he cites for one proposition: there is no murder scene exception, therefore, a warrantless search is not constitutionally acceptable simply because a homicide has recently occurred there. Thompson v. Louisiana overturned this Court's opinion, State v. Thompson, 448 So.2d 666 (La.1984), which held a warrantless search of defendant's home was valid when defendant had a diminished expectation of privacy in her home because she called for aid after murdering her husband, and because her daughter, called by her mother, let the police in on her apparent authority over the premises.
The U.S. Supreme Court held the opinion was indistinguishable from and conflicting with Mincey v. Arizona, supra. Thompson was tried for the murder of her husband. Deputies were summoned to the house by defendant's daughter, who reported a homicide. The daughter said the defendant shot her husband, attempted suicide by ingesting pills, but then called her daughter, told her of her acts and asked for help. The daughter called police and went to her parents' house, admitting the deputies. The deputies found the defendant unconscious and her husband dead of a gunshot wound. Defendant was transported to the hospital. Homicide investigators arrived thirty-five minutes later, entered the premises and searched the scene for two hours, locating incriminating evidence of the murder and attempted suicide.
The Supreme Court held the two-hour general search of defendant's house was a significant intrusion on her privacy and was invalid without a warrant. Discovery of the evidence did not occur in the initial sweep of the house for victims or the killer, *557 or in the plain view exception in the initial entry. Defendant's call for help did not convert her home into a public place where no warrant is required. The Supreme Court in Thompson reaffirmed the rule that "searches, conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well delineated exceptions." Consent is one of the exceptions to the warrant requirement.
The State contends police lawfully entered the murder scene at 639 Louisiana Street upon the consent of Paul "Blue" Perry and Edward Ashford. Three men resided at this house: Paul "Blue" Perry and the victims Randall Perry and Bryan LeBlanc. Ashford was the caretaker for this house and his stepson, Bryan LeBlanc, lived there. Ashford's wife was concerned about Bryan, a diabetic, and Ashford went to the house about 5 P.M. on July 19, 1983, at her urging. He found the doors locked and could not get an answer from within. The front door fell off its hinges as he knocked on it. He walked in and discovered the bodies. After Ashford sought police help, he met the police chief at the house and told him to go inside. After other officers arrived, two officers walked to the Perry residence two doors away and saw on the carport floor pieces of flesh, skull and bone marrow. They then entered the second murder scene, at 810 Seventh Street.
The State argues it had the initial consent of Ashford, the caretaker, to enter 639 Louisiana Street. The only surviving resident of the house at 639 Louisiana was Paul "Blue" Perry, who was working on an offshore oil rig at the time of the murders. Chief Deputy Ted Gary said he spoke to "Blue" Perry and obtained consent for the continuing searches of his house. Perry was returned to Lake Arthur after the bodies were discovered. Gary recalled talking to Blue Perry before re-entering the house. In addition, the State argues, Ashford was sufficiently related to the house to give consent. Ashford was the caretaker, had a key to the house, and had ongoing permission to enter the house whenever he deemed it necessary.
There is no showing that defendant possessed any privacy interest at 639 Louisiana Street. He did not reside there and had no property there. Neither Ashford nor Blue Perry withdrew the consents to search the house. Both had sufficient interest in the house to give valid consent to enter for all the searches. We uphold the warrantless searches of 639 Louisiana Street as lawful consent searches.
Defendant also objects to the evidence seized at 810 Seventh Street, where his parents lived. The bodies of his parents and two-year-old Anthony Bonin were found inside, when deputies entered after finding the two bodies at 639 Louisiana Street and discovering pieces of skull, flesh and bone marrow in the carport outside 810 Seventh Street. Again, the initial entry was unequivocally lawful, since officers were searching for victims or suspects.
Michael Owen Perry did not reside at 810 Seventh Street at the time of the murders. He lived in a trailer behind his parents' home. There is ample evidence that defendant was not permitted in his parents' home without their permission. The doors were kept locked and Michael Owen Perry was not given a key. He had to knock to be admitted. There was no showing defendant had any of his property within his parents' home, or that he used it as an extension of his residence. Officers found evidence of forced entry into the house. Defendant's statement to the jailer admitted he broke into the house to wait for his parents. There is no proof defendant had a privacy interest at 810 Seventh Street. To the contrary, he could not enter the house of his own will and he had no property inside. This case is distinguishable from Mincey and Thompson, where in both cases the defendant's home was searched. There was no living person who had a privacy interest in the house at 810 Seventh Street. Therefore, the entries of *558 the house were not in violation of anyone's privacy interest.
The Louisiana Constitution does not limit standing to challenge a search to those who live in the premises and thus have a reasonable expectation of privacy in it. La. Const. Art. I, § 5 provides in pertinent part: "Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court." (Emphasis added.) The first part of the section states that every person has the right to "be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." Thus, it seems that there must be an invasion of someone's rights to privacy before there can be an unreasonable search.
It is well settled that the Fourth Amendment to the United States Constitution protects people, not places. It is the individual's reasonable expectation of privacy that our society values and the constitution protects. Katz v. U.S., 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

State v. Hines, 323 So.2d 449, 450 (La. 1975).
Michael Owen Perry was a resident of the trailer and the search of that residence was with a warrant. The evidence seized from the two murder scenes was properly admitted into evidence. There is no merit in this assignment.

ASSIGNMENT OF ERROR NO. FIVE
Defendant argues the trial court erred in allowing the State to present to the jurors numerous color photographs of the five homicide victims. He contends the photographs were not necessary for any probative purpose and inflamed the jury, overwhelming their reason. (We will discuss later in this opinion whether the use of the photographs introduced an arbitrary factor into the jury's sentencing recommendation.) The photographs were unnecessary, he argues, because the pathologist who performed the autopsies testified to the cause of death, the location and number of gunshot wounds, the type of weapon used and the approximate distance of the victim from the gun when fired. Sheriff's deputies testified in great detail to the location of the victims in the house, the location of gunshot holes in the walls, the splatter of blood, tissue and brains; the deputies used drawings, cut outs and body figures to illustrate their testimony.
Defendant objected timely at trial to the admission of the photographs into evidence. The judge admitted the photographs in evidence, commenting, "I think the probative value will outweigh whatever prejudicial effect could happen. I realize, of course, that they are unpleasant pictures to look at but that's one of the situations that we, as well as jurors, have to face in a case of this kind.... It corroborates everything this doctor (the pathologist) was saying in the cause and effect and the other aspects, and I think that the corroboration in this matter is very important, so we're going to admit them."
The State introduced a total of 170 color photographs in evidence. The photos show the interior and exterior of the two houses, the condition of the house as it was found and photos of the houses after the victims were removed. There are eight photos taken at the pathologist's directions before he began autopsies. The total also includes four portraits of the victims as they appeared in life. The great majority of the photographs are a painstaking photographic tour through the two houses, with officers taking pictures of all conceivably relevant evidence. Of the 158 photos taken at the two murder scenes, 23 show one or more of the victims.
The photographs of the remains of five murdered persons can not be less than gruesome. The pictures are unpleasant. All the victims were struck in the head with blasts from a shotgun fired at close range, sometimes at point-blank range. Many of the photographs show the destruction of the skulls, particularly the photographs taken prior to autopsy. No amount of testimony or the use of diagrams can *559 depict the murders with such effect as the photographs.
The defendant cannot force the State to use drawings or other evidence instead of photographs. The defendant cannot deprive the State of the moral force of its case by offering to stipulate to what is shown in photographs. State v. Watson, 449 So.2d 1321 (La.1984); State v. Lindsey, 404 So.2d 466 (La.1981). The court's admission of allegedly gruesome photographs will be overturned on appeal only if the prejudicial effect of the photographs clearly outweighs their probative value. State v. Watson, supra; State v. Boyer, 406 So.2d 143 (La.1981).
The photographs of the murder scenes are clearly relevant, corroborating the testimony of the State's witnesses as to the location of the bodies, the apparent sequence the murders occurred in and the multiple gunshot wounds to at least two of the victims.
This Court will not find the photographic evidence was admitted in error unless the photographs are so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Watson, supra; State v. Ward, 483 So.2d 578 (La.1986).
The photographic evidence was admitted during the trial's guilt phase following testimony of the investigating officers and the pathologist on Friday, October 25, and Saturday, October 26, 1985, respectively. The court recessed for the weekend following introduction of the last of the photographs. Trial resumed Monday, October 28, 1985. Guilty verdicts were returned October 31, 1985, and the jury deliberated and decided on the death penalty the same date. The emotional impact of the photographs had time to dissipate before the State concluded its case and the jury reached the deliberative stage. Without doubt, the primary effect of having viewed the photographs was to impress upon the individual juror the seriousness of the task to which he or she was sworn. The State was entitled to no less.
This Court, in State v. Lowenfield, 495 So.2d 1245 (La.1985), considered the admissibility of photographs of five murder victims. Lowenfield was convicted of murdering four adults and one child in his former girlfriend's house. All the victims were shot in the head and all suffered multiple gunshot wounds. The weapons used were a .38 caliber pistol and a .22 caliber rifle. This court found the prejudicial effect of the pictures did not outweigh their probative value. The photographs of murder victims are admissible to prove corpus delicti, to identify the victims, to corroborate the cause of death and to show location, placement and severity of wounds. One photograph of each victim was put into evidence.
We find the photographic evidence was relevant and probative in proving the State's case against Michael Owen Perry. They proved corpus delicti, helped identify the victims, corroborated the cause of death, the types of weapons used and the location and severity of the wounds. We find no merit in this assignment of error.

ASSIGNMENT OF ERROR NO. SIX
Defendant's sixth and final assignment of error contends the trial judge erred when he failed to grant defendant's motion for a mistrial following a state witness's oblique reference to the defendant's theft of a radio. Defendant argues this evidence of other crimes prejudiced the jury against him and led to his conviction on five counts of first degree murder.
We find no merit in this assignment of error. This Court has addressed similar situations and found other crimes evidence insignificant when weighed against the offense for which the defendant was on trial. State v. Parker, 421 So.2d 834 (La.1982), cert. den., 460 U.S. 1044, 103 S.Ct. 1443, 75 L.Ed.2d 799; State v. Abercrombie, 375 So.2d 1170 (La.1979), cert. den., 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787. In Parker, supra, the defendant was on trial for two counts of first degree murder in connection with the armed robbery of a restaurant. Defendant's arrest came 17 *560 days after the robbery-murders, following another armed robbery, when police chased the car defendant occupied. The prosecutor carefully deleted reference to the second armed robbery but explained the apprehension of defendant as the consequence of a traffic violation. This Court said: "The evidence of misdemeanor traffic violations was hardly evidence of other crimes of any significance and did not portray him prejudicially as a `bad man' capable of murder." Parker at 840. The same thing, in the context of multiple murders, might reasonably be said of the theft of a radio.
In Abercrombie, supra, there was evidence of a minor vandalism, but the Court said such evidence would not "inflame a jury to the point that it would be influenced to convict an accused of first degree murder." Abercrombie at 1176.
The reference to Perry's alleged theft occurred in the explanation of his apprehension in Washington, D.C. The murders occurred in Lake Arthur, Louisiana, around noon on July 17, 1983. Perry arrived in Washington, D.C. in late evening on July 18, 1983. The bodies were discovered the next day. Perry was arrested July 30, 1983. He came to the attention of Washington police after a person checking into a Washington hotel complained Perry walked off with a radio belonging to the hotel guest. The Washington policeman testified he was merely running a routine check on the man involved in the theft complaint when he was informed Perry was wanted in Louisiana for five murders. The policeman had not yet arrested Perry for theft.
An explanation of the Washington arrest was necessary to lay the foundation for introduction of evidence found in Perry's Washington hotel room, and the discovery of Perry's parents' automobile in Washington. A television set recovered from the Washington hotel room was found with the names of all five victims marked on the side of the set. The mention of Perry's alleged theft of the radio came as the prosecutor questioned Washington patrolman James Young about how he came into contact with Perry. Young said Perry and the complainant were disputing the ownership of a radio. Defendant objected timely.
The defendant is correct that the State may not introduce evidence of other crimes without giving notice that it intends to do so. State v. Prieur, 277 So.2d 126 (La. 1973). The State replies it never intended to introduce evidence of the theft of the radio and carefully avoided saying theft. In fact, the prosecutor replies, the defendant's counsel was the first person to categorize the encounter as a complaint of a theft.
We find no merit in this assignment. The evidence of the theft of a radio pales in significance to the five counts of first degree murder and would not portray defendant as a "bad man" capable of murder.

CAPITAL SENTENCE REVIEW
This Court reviews every death sentence to determine if the penalty is excessive. La.C.Cr.P. art. 905.9 and Louisiana Supreme Court Rule 28. The Court is required to determine:
(a) Whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) Whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) Whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

PASSION, PREJUDICE AND ARBITRARY FACTORS
The jury's conviction of Perry for first degree murder on all five counts was supported by the jury's finding of two aggravating circumstances on each count: the offender knowingly created a risk of death or great bodily harm to more than one person; and the offense was committed in an especially heinous, atrocious or cruel manner.
We have previously discussed, in Assignment of Error Number Five, the *561 State's use of multiple color photographs of the victims, and the effect of the photographs during the guilt stage. We now decide if the photographs introduced an arbitrary factor into the jury's recommendation of the death penalty.
The photographs were introduced in the guilt phase, and were not used in the sentencing phase to arouse the jurors' hostility toward the defendant. In the context of a case with substantial proof of guilt for five unprovoked murders a death penalty recommendation is not surprising. It is difficult to believe the photographs pushed the jury toward a recommendation of death for this mass murder.
The State contended the murders were committed in an especially heinous, atrocious or cruel manner. To prove this, the State introduced, inter alia, photographs of the victims.
The use of evidence to prove a statutorily enumerated circumstance in support of the death penalty, although it may prejudice the defendant's interests, does not introduce an arbitrary or prejudicial factor sufficient to require the penalty be set aside. We find the evidence of this alleged aggravating circumstance did not constitute an arbitrary factor in the proceedings.
The defendant contends further the jury was influenced by an arbitrary factor when the prosecutor misstated the law during closing argument of the sentencing phase. We find the misstatement does not present reversible error. The prosecutor spoke only in rebuttal of defense counsel's closing argument, but during that rebuttal, the prosecutor said, "The law says any person that's convicted of a first degree murder shall be sentenced to death."
The Court will not reverse on the basis of an improper comment during closing argument unless the Court is convinced the comment influenced the jury and contributed to the verdict. State v. Bates, 495 So.2d 1262 (La.1986); State v. Ford, 489 So.2d 1250 (La.1986). There was no defense objection to this misstatement of the law. The misstatement was overcome by the judge's instructions to the jury. The court correctly stated the law requires a unanimous finding of an aggravating circumstance and requires the weighing of any mitigating circumstances prior to the jury's decision to consider the death penalty. The judge's charge in effect informed the jury a person found guilty of first degree murder does not automatically receive the death sentence.

MITIGATING CIRCUMSTANCES
The defense argues the jury ignored the mitigating circumstances of defendant's alleged mental disorders. The defense counsel used its closing argument at sentencing to focus on defendant's mental condition. Counsel asked the jurors to consider defendant's appearance, mannerisms and conduct during the eight-day trial. Defendant's counsel said the defendant was not like normal people, that he had a mental disorder which caused him to commit a vicious crime, which normal people abhor. Three doctors had testified the defendant suffers from a mental disorder, the jury was reminded. The prosecutor's rebuttal said murderers are not ordinary people: "That's why they do what they do." He said the physicians who believed defendant was sane observed him for five months at a mental institution. Through both the defense counsel's argument and the court's instructions to the jury, the jurors were reminded they had to consider mitigating circumstances.
Defense counsel argues the mitigating circumstances were apparently overlooked by the jury. We find the conflicting medical testimony on defendant's mental condition was provided to the jury and the jurors chose to believe the State's experts, that the defendant did not suffer from a mental disorder so overwhelming that he was insane or unable to control or understand his actions.

STATUTORY AGGRAVATING CIRCUMSTANCES
The jury found the evidence supported the existence of two aggravating *562 circumstances: the offender knowingly created a risk of death or great bodily harm to more than one person; and the offense was committed in an especially heinous, atrocious, or cruel manner.
The evidence fully supports the aggravating circumstance: defendant knowingly created a risk of death or great bodily harm to more than one person. He killed two young men at 639 Louisiana Street within seconds. Defendant's parents and his two-year-old nephew were gunned down as they entered their home. He not only created a risk of death to more than one person at each crime scene but converted the risk into accomplished actuality. The random firing of weapons, as shown by the physical evidence, cannot be less than a risk of death to the multiple persons present at the scenes.
The jury's finding that the murders were committed in an especially heinous, atrocious or cruel manner was previously discussed in the consideration of arbitrary factors in sentencing. It is unnecessary that we consider the subject matter in the context of statutory aggravating circumstances. Only one aggravating circumstance need be found for the imposition of the death penalty. La.C.Cr.P. art. 905.3; State v. Bates, supra; State v. Byrne, 483 So.2d 564 (La.1986); State v. Rault, 445 So.2d 1203 (La.1984). Since we have determined the jury was correct in finding the offender created a risk of death or great bodily harm to more than one person, the death penalty is validated.

PROPORTIONALITY OF THE SENTENCE
The Court is required to weigh the sentence of death against the particular defendant and the offense(s) of which he is found guilty.
Michael Owen Perry was 28 when he committed these five murders. He lived in a small trailer behind his parents' home. He was unemployed, despite having graduated from high school, then attending one university briefly and later completing thirteen hours of college credit at LSU-Eunice. His work history was brief. He either resigned or was fired from his jobs. His uncle said the defendant stated he would not work because his parents had to support him.
Perry was one of three children. His brother died in an oil rig accident. Susan, his sister, has been committed to Central Louisiana State Hospital on several occasions. Perry's history of emotional or mental disorders dates to 1979, when his parents asked he be examined by psychiatrists at the University of Texas Medical Branch Hospital at Galveston. There is no evidence he was hospitalized then. In March 1981, his parents obtained his commitment to Central State Hospital at Pineville. He was discharged on May 22, 1981 and referred to a community mental health clinic. On September 11, 1981, he was readmitted to the hospital at Pineville, but he walked away the same day and returned home, where his parents apparently allowed him to stay.
The reports of mental health professionals and general practitioners who examined him subsequent to the homicides has been set forth previously in great detail, and we will not reiterate that evidence. We note only the jury apparently chose to believe the state's expert witnesses and their opinion that the defendant's mental problems did not rise to the level of insanity. Even the physicians who testified for the defense said Michael Owen Perry was smart enough to act as if he were insane when it might benefit him. They also said Perry could conform his behavior to the norm most of the time.
The offense was a shocking mass murder in a small town. Five members of defendant's family were killed on a Sunday morning, two as they slept in their beds. After killing his parents, his cousins and a nephew, the defendant took money from his mother's belongings and from his father's pockets and fled the state in his father's car, taking refuge in a Washington hotel. He killed the adult victims in their own homes in a violent, bloody encounter which was deliberately planned. He waited for *563 his parents more than an hour following his murder of his two cousins in a house just two doors away. A total of three weapons were used. The death penalty in such a case is proportionate to the offenses and to this particular defendant.
We must also weigh this death sentence against the death sentences imposed in other cases in the jurisdiction in which this case was tried. State v. Ford, supra. If the recommended sentence is inconsistent with sentences imposed in similar cases, an inference of arbitrariness arises. State v. Glass, 455 So.2d 659 (La.1984).
Although the homicides occurred in Jefferson Davis Parish, the trial was moved to East Baton Rouge Parish after the court experienced initial difficulty in selecting a jury. Since 1978, there have been five murder trials in East Baton Rouge Parish where the jury recommended the death penalty. All those cases involved the death of one victim. One case was the rape and murder of an eleven-year-old child. The other four cases were murders committed during an armed robbery.
In State v. Williams, 392 So.2d 619 (La. 1980), defendant James C. Williams was convicted of killing a service station owner during an armed robbery. The case was remanded by this Court for the judge's failure to instruct the jury that lack of a unanimous sentence recommendation would result in a sentence of life imprisonment. After remand, defendant received a life sentence.
Robert Wayne Williams was executed for the murder of a supermarket security guard during a holdup. State v. Williams, 383 So.2d 369 (La.1980), 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828. The victim was shot in the face with a shotgun.
Colin Clark was convicted of a murderarmed robbery and this court affirmed his conviction and death sentence, State v. Clark, 387 So.2d 1124 (La.1980). A federal court later reversed the conviction and the sentence. Clark v. Louisiana State Penitentiary, 694 F.2d 75 (5th Cir.1982). Clark subsequently entered a guilty plea to first degree murder without capital punishment.
The conviction and death sentence of Andrew Lee Jones for the rape-murder of an eleven-year-old child was affirmed by this Court in State v. Jones, 474 So.2d 919 (La.1985), cert. den., ___ U.S. ___, 106 S.Ct. 2906, 90 L.Ed.2d 993.
Jeffrey C. Clark killed his victim during an armed robbery. His conviction and death sentence were affirmed. State v. Clark, 492 So.2d 862 (La.1986).
None of these cases involves multiple victims. In Perry's case, the State argued the murders were committed during the perpetration of an aggravated burglary of the two houses and the armed robbery of Perry's parents. The jury did not return with a verdict agreeing with the state's argument on those circumstances.
In a case most similar to this one, this Court affirmed the death sentences imposed on Leslie Lowenfield for three counts of first degree murder. He was also convicted in Jefferson Parish of two counts of manslaughter. State v. Lowenfield, supra. Lowenfield killed his former girlfriend after she spurned him. He also killed three other members of her family and a neighbor who ran into the house when he heard gunshots. The psychiatrists who examined Lowenfield found him to be "angry, primitive, paranoid, and narcissistic." Lowenfield, unlike Perry, did not have a history of treatment in mental hospitals.
Defendant did kill all five victims in their homes. In State v. Williams, 490 So.2d 255 (La.1986), this Court found a review of death cases state-wide showed juries "often find death sentences appropriate where an innocent victim was murdered inside the sanctuary of his or her own home." Williams, supra at 264.
The death sentences for five offenses of first degree murder is not disproportionate to other cases in East Baton Rouge Parish where the death penalty was recommended.

SANITY DETERMINATION PRIOR TO EXECUTION
The State of Louisiana will not execute one who has become insane subsequent *564 to his conviction of a capital crime. State v. Allen, 15 So.2d 870 (La.1943). No state imposes the death penalty on the insane. Ford v. Wainwright, ___ U.S. ___, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). The State will not impose the death penalty on Michael Owen Perry if a court determines he has become insane subsequent to his conviction for first degree murder and lacks the capacity to understand the death penalty. Counsel for the defendant may apply to the trial court for appointment of a sanity commission to make such a determination. Indeed, the allegation of mental incapacity may be raised by the court or the prosecutor. La.C.Cr.P. art. 642.
If the defendant seeks a sanity commission prior to execution, he bears the burden of providing the trial court with a reasonable ground to believe he is presently insane. State v. Allen, supra; La.C.Cr.P. art. 642; State v. Lowenfield, supra. Defendant's burden is to show by a preponderance of evidence that he lacks the present capacity to undergo execution.
We have discussed extensively Perry's mental capacity to proceed despite his withdrawal of the plea of "not guilty and not guilty by reason of insanity." We have determined the defendant was capable of proceeding at trial. A similar review might be in order prior to execution. We stress that the determination of defendant's sanity is for the trial judge, not a sanity commission alone. State v. Rogers, supra.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until
(a) defendant fails to petition the United States Supreme Court timely for certiorari,
(b) that court denies his petition for certiorari,
(c) having filed for and been denied certiorari defendant fails to petition the United States Supreme Court timely under their prevailing Rules for rehearing of denial of certiorari, or
(d) that court denies his application for rehearing. CONVICTION AND SENTENCE AFFIRMED.
NOTES
[*] Pike Hall, Jr., Associate Justice pro tempore, in place of Mr. Justice Lemmon.
[1] As stated by Dr. Kang in the second sanity commission and the motion to suppress hearings, trigger words were used in examining the defendant to determine his reaction to subjects that had previously resulted in psychotic behavior on his part. This defendant reacts visibly to the words "Olivia Newton-John." The mention of those words has caused him, after previously exhibiting no psychotic manifestations during an interview, to behave in a deviant manner. He would start rambling, become aggressive and hostile, and talk endlessly. In this way he evidences his loss of touch with reality.