CARAWAY, J.
|¶ Following a bench trial, Robert Calvin Farris was convicted of two counts of second degree murder and sentenced to life imprisonment at hard labor without benefits on each count, to be served consecutively. Farris now appeals. We affirm the defendant’s convictions and sentences.

Facts

On January 3, 2013, Madonna Wachter and Stephen Bryant were found dead in their home, located at 243 Columbia Street, in Shreveport, Louisiana. Both victims sustained fatal gunshot wounds. Officers discovered numerous threatening text messages in Madonna’s cellphone which referenced a $600 debt that she owed to “Robert” and that she was supposed to pay on January 2, 2013. The messages indicated that the sender wanted his money or “he was going to get it in blood.” Madonna had $326 in her hand when she died. Based on references in the various text messages and the owners/users of the cellphones, officers determined that Robert Farris had sent the threatening text messages and was fronting Madonna drugs for sale. Further, during a search of Farris’s house, officers located two shell casings which matched the two shell casings found at the crime scene.
On March 13, 2013, Farris was charged by bill of indictment with two counts of second degree murder. He waived his right to a jury trial, and the bench trial began on August 25,2016.
*881 Following the bench trial, the judge found Farris guilty of both counts of second degree murder. Thereafter, Farris filed motions for a new trial and post-verdict judgment of acquittal, arguing that the state did not exclude Uevery reasonable hypothesis of innocence, specifically, his alibi. Farris also claimed that in its oral reasons for judgment, the court incorrectly stated that he was identified at the crime scene by a passerby on the evening of the homicides, noting that the witness only stated that she saw a black male. The trial court denied both motions based on the evidence presented at trial.
On September 23, 2015, the trial court sentenced Farris to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence, on each count to be served consecutively. Thereafter, Farris timely filed a motion to reconsider sentence, claiming that the sentences were excessive.[1] This appeal followed.

Discussion

First, challenging the sufficiency of the evidence, Farris argues that this case was purely circumstantial and that no rational factfinder could have excluded his reasonable hypotheses of innocence that there was no evidence connecting him to the crime scene and that he provided an un-contradicted alibi. Farris urges that the police failed to investigate Dalando Garner who had access to all of the phones from which the threatening text messages were sent, and lied to the police about his alibi. Farris argues that text messages can be sent by anyone and that a name reference in a text does not rise to proof beyond a reasonable doubt.
In a pro se brief, Farris additionally argues that he established that he was in Texas with his sister at the time of the murders.
At trial, Dalynda Gilcrease, Madonna’s sister, testified that she went to her sister’s house on January 3, 2013, and discovered Stephen. Gilcrease 1 ^called 911. After the homicides, Gilcrease found a piece of paper in Madonna’s lunch bag, with the name “Farris, Ferriss” along with two phone numbers, 638-9269 and 573-3637, written in Madonna’s handwriting, which she turned over to police.
Gilcrease testified that she had suspicions that Madonna was involved with drugs as she had seen her with packets containing white powdery substances and rolls of money. Gilcrease recalled that in May 2012 Robert Farris came to Madonna’s home.
LaRonda Renee Carter stated that she purchased a cellphone for Madonna, with the number 470-0639. After the homicides, she found a piece of paper in Madonna’s purse, on which Madonna had budgeted payment of her bills, including a payment to “Rob” for $100, which she turned over to police.
John Farris, Farris’s father, testified that from December 2012 to January 2013 defendant lived with him at a home on West 71st Street. John claimed that around that time he had a cellphone with the number 200-5074 (one of the phone numbers that sent threatening text messages to the victim) that his daughter got for him. John testified that “a lot of people” used his cellphone, including Farris and Dalando Garner. John stated that he did not know Madonna Wachter or text her as he does not know how to text.[2]
*882 Phyllis Lane testified that her daughter, Angelia Carter, is Farris’s girlfriend. Lane stated that Angelia Carter’s cellphone number was 828-3399 (the other phone number that sent threatening text messages to the | ¿victim). Lane stated that when she would call that number, Farris would answer the phone most of the time.
Dianna Ross, Farris’s sister, testified that she sent the threatening text messages to Madonna from phone number 200-5074, not Farris. Ross stated that phone was in her father’s name, and that Farris never used it: Ross claimed she sent the text messages because Madonna was calling 200-5074, all the time asking for Farris. Nevertheless, Ross admitted that she originally told the police that Far-ris sent the text messages because she was angry with her entire family.
Corporal Sherry Stump of the Shreveport Police Department, crime scene unit, testified that on January 3, 2013, around 10:15 a.m., she responded to the crime scene and observed the two victims. Corporal Stump noted that Madonna had $325 in her right hand and her cellphone was on the floor by her feet.
Corporal Stump testified that at the crime scene three projectiles were found in the sunroom, and two .40 caliber shell casings were found, one on the floor and one on the couch next to Stephen. Drugs and drug paraphernalia were also found in the victims’ bedroom. Additional money was found in Madonna’s purse in the bedroom. No fingerprints in the house were matched to Farris.
On January 4, 2013, Corporal Stump processed Farris’s father’s house, where officers, executing a search warrant, located two .40 caliber shell casings in the yard near the front door. A broken Motorola flip phone was also found in the front yard of the house.
| (¡Carla White, an expert in firearms identification from the North Louisiana Crime Lab, examined the two .40 caliber shell casings found at the crime scene, the two .40 caliber shell casings removed from John Farris’s house, and the three bullets recovered from the crime scene, White determined that all four of the shell casings, recovered from both locations, were fired from the same weapon and were the same brand of ammunition. White concluded that the three bullets were .40 caliber, with the same rifling characteristics. Because of damage to the bullets, White was not able to determine whether the bullets were fired from the same weapon.
Sergeant Patrick McConnell of the Shreveport Police Department testified regarding a traffic stop he conducted of Far-ris on May 23, 2012. A video of the traffic stop showed Farris give his address and state that the vehicle he drove belonged to a woman named Madonna. A license check determined that the vehicle belonged to Madonna Wachter.
Investigator David W. Hensley, of the homicide screening division of the Caddo Parish District Attorney’s Office, stated that through his investigation, he learned that cellphone numbers found in Madonna’s lunch bag, 638-9269 and 828-3399, were registered to Roy Sullivan who gave the phones to his daughter, Kathy Sullivan, Dalando. Garner’s girlfriend. Sullivan gave the phones to Dalando Garner and Angelia Carter. Dalando Garner and Far-ris regularly used both phones. Dalando Garner and Sullivan claimed that they were at the Super 8 Motel on January 2, 2013, but there were no records that they were actually there.
Detective Michael Escude, of the Caddo Parish Sheriffs Office, monitors and oversees the inmate telephone systems at Cad-do Correctional ^Center. Detective Escude testified that he reviewed the calls made *883 by Farris to his mother while he was in jail. In the first call, on January 18, 2013, Farris stated that his lawyer told him he was in jail because of the text messages that he sent “before Christmas.” Also, referencing the text message saying that he would “get it in blood if you don’t pay me,” Farris explained that he was joking and even uses that phrase with his mother. In the second call, on March 13, 2013, Farris stated “I went over there and left and I didn’t do nothing.” In the third call, on May 2, 2013, Farris and his mother were talking about how the police put his photo on the news. Farris explained that they did that so somebody could come forwárd and say they saw him there, and he stated of course they saw me, “I was over there getting my money ... so don’t be stupid.”
Detective Joshua Mayfield, of the Shreveport Police Department, violent crimes unit, testified regarding the text messages he located on Madonna’s cellphone. On December 17, 2012, at 4:00 p.m., Madonna (0639) texted John’s phone (5074) and made the following statements:
“Robert.. .1 let you know.. .1 have half of balance by 5- after I pay to have car fix... trying to come up with rest so we be straight. Doing my best.. .will call you after 530 when get home...”
At 6:20 p.m. John’s number texted Madonna back and stated, “Naw man thats wrong i need my money u playin wit me now.” At 6:22 p.m. Madonna texted John’s number and stated, “No robert.. .im doing my best.. .and trying to work things out. I dont play like that.”
The following day, December 19, 2012, a series of texts from Angelia Carter’s phone (3399) to Madonna occurred before 9:00 a.m. Madonna did not respond and four texts followed from Angelia’s phone. The first |7referenced “U” making me wait for my money. The final three texts included the following statements:
But u kno wat i want never make that mistake again and front yall nuttin after dis. Im waiting till the first the juice imma add like steve said i need 500 on tha first if u aint willing to pay that tell me soon as you read dis message so i know wat i need to do.
But on tha first like i said imma want 500 r yall gone wish yall neva meet me take it as a threat. All yall want so the police dis and all i wouldnt give a fuck cuz dont nobody tell me when they gone pay me. Like i said i need 500 on that first r i want blood for either one of yall and u can go to the cops i wouldnt give a fuck.
I keep a gun for whoever jus did a year for murder behind this same shit look it up on chanel 12 my last name farris.
On December 30,2012 (Sunday), a series of texts between John’s phone and Madonna’s phone occurred between 11:00 a.m. and noon. The text from John’s stated that, “U giving me mine 2 morrow 5 bills for waiting a mounth and fucking up my Christmas huh text me when u see dis cuz its bout dat time.” A text from John’s phone then stated, “im getn paid dis time r getn it in blood believe dat like u do in jesús.” Two texts from Madonna to John’s phone followed. Madonna stated:
I am not giving you any sort of attitude. .. .unlike the many text I am getting. . .and tomorrow is 31st.. .pay day for me is 530pm on Wednesday the 2nd-as the 1st is not work day.. .my comment was that I have your phone number in which to call you.. .Wednesday after 530... as we have discussed already”
“I see no reason for you to continue to contact me in any way shape or form. I will call you Wednesday (January 2, 2013) after 530pm ... that is not a threat nor a thanks. I will call you”
*884 Detective Mayfield testified that he determined that the last call Madonna made was to John’s number 200-5074 on 5:14 p.m. on (Wednesday), January 2, 2013. The last call Madonna received was from Angelia’s number 828-3899 at 6:12 p.m. that same date.
| ^Regarding the December text message which stated “jus did a year for murder behind this same shit look it up on chanel 12 my last name farris,” Detective May-field found a news article from April 7, 2011, on the KSLA (TV Channel 12) website, referencing a drive-by shooting for which Farris and Dalando Garner were arrested and charged with attempted murder.
Detective Mayfield obtained a search warrant for John Farris’s address. When he was arrested, John Farris confirmed that his cellphone number was 200-5074. When Detective Mayfield advised John that he was investigating a double homicide and that threatening text messages were sent from John’s phone to the victim, John stated “That must’ve been my son Robert. He’s the one that uses that phone.”
Detective Mayfield then went to Angelia Carter’s house, where he came into contact with Farris and Dalando Garner. Dalando stated that his phone number was 676-3361, and that he did not know anything about Farris selling drugs to the victims or the homicides. Angelia Carter stated that her phone number was 828-3399, and that Farris would use her phone to call and text message people.
Detective Mayfield testified that Dianna Ross contacted him and stated that she believed that Farris was responsible for the homicides. Ross told Detective May-field that Farris supplied narcotics to Madonna and that he was upset with Madonna because she owed him money. Ross stated that around New Year’s, she saw threatening messages on her father’s phone and brought them to his attention, but she was told to delete the messages. Ross stated that Farris called Madonna from different phone numbers because Madonna was avoiding his calls. Ross stated that Farris had cut his hair off |flafter the homicides, and that she thought it was suspicious because he had done the same thing before when he was involved in a different shooting.
Detective Mayfield admitted that he did not know who was in possession of the subject phones at the time of the murders. Regarding Farris’s alibi that he was in Texas with his sister, Prince Ann Farris, Detective Mayfield noted that in her statement Dianna Ross stated that Farris went to Texas to apply for an apartment before New Year’s.
The defense called Prince Ann Farris to testify that Farris was with her in Texas at the time of the homicides, although she admitted that she did not tell Farris’s attorney this her until a year and a half later.
The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Crossley, 48,149 (La.App. 2 Cir. 6/26/13), 117 So.3d 585, writ denied, 13-1798 (La. 2/14/14), 132 *885 So.3d 410. This standard, now legislatively embodied in La. C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La. 2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied, 09-0310 (La. 11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied, 09-0725 (La. 12/11/09), 23 So.3d 913, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010).
Direct evidence provides proof of the existence of a fact, for example, a witness’s testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; State v. Lilly, supra; State v. Robinson, 47,437 (La.App. 2 Cir. 11/14/12), 106 So.3d 1028, writ denied, 12-2658 (La. 5/17/13), 117 So.3d 918.
The trier of fact is charged with weighing the credibility of this evidence, and on review, the same standard as in Jackson v. Virginia is applied, giving great deference to the fact finder’s conclusions. State v. Hill, 47,568 (La.App. 2 Cir. 9/26/12), 106 So.3d 617. When the fact finder at trial reasonably rejects the hypothesis of innocence advanced by the defendant, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. A reasonable 111 alternative hypothesis is not one which could explain the events in an exculpatory fashion, but one that is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mack, 13-1311 (La. 5/7/14), 144 So.3d 983; State v. Captville, 448 So.2d 676 (La. 1984).
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Glover, 47,311 (La.App. 2 Cir. 10/10/12), 106 So.3d 129, writ denied, 12-2667 (La. 5/24/13), 116 So.3d 659. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
Second degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1.
Specific intent is the state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Smith, 49,839 (La.App. 2 Cir. *886 5/20/15), 166 So.3d 416, writ denied, 15-1244 (La. 6/3/16), 192 So.3d 753. |18The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Lloyd, 48,914 (La.App. 2 Cir. 1/14/15), 161 So.3d 879, writ denied, 15-0307 (La. 11/30/15), 184 So.3d 33. The determination of whether the requisite intent is present is a question for the trier of fact. State v. Huizar, 414 So.2d 741 (La. 1982); State v. Lloyd, supra.
The evidence presented at trial was sufficient to support the defendant’s convictions for second degree murder. The expert testimony establishing the manner of Madonna and Stephen’s deaths was sufficient to establish the perpetrator’s specific intent to kill. The remaining evidence, although circumstantial, was sufficient to establish the defendant as that perpetrator.
The defendant and Madonna had a long-term relationship, likely based on drugs. In the weeks before her death, Madonna received numerous text messages referencing a $500 debt that she owed and was struggling to pay. The messages contained threats of what would happen if she did not pay, including “yall gone wish yall neva meet me,” “i need 500 on that first r i want blood,” “I keep a gun for whoever jus did a year for murder behind this same shit,” and “im getn paid dis time r getn it in blood.” The trial judge reasonably concluded that the defendant sent the messages. The messages were sent from numbers 200-5074 and 828-3399, both of which the defendant had access to and used regularly, as those phones belonged to his father and his girlfriend. In the message exchanges, Madonna identified the sender as “Robert,” and the number 200-5074 was saved in her phone as “DeRoss-200 Robert” and “Dad’s phone.” Although the defendant’s sister | ^claimed she sent the threatening text messages, she originally told police that the defendant sent the messages. Also, in the jail phone call to his mother, the defendant admitted that he sent at least some of the messages.
On January 2, 2013, Madonna was supposed to pay the defendant the money she owed him, as she stated in the text messages. Near the time of her death, the last call Madonna made was to 200-5074, the defendant’s father’s number, at 5:14 p.m., and the last call she received was from 828-3399, the defendant’s girlfriend’s number, at 6:12 p.m. An eyewitness testified that she saw a black male on the front porch of the victims’ house yelling on that date around 6:00 p.m. In a jail phone call to his mother, the defendant admitted that he was at the victims’ house that night to get his money.
Further, the .40 caliber shell casings found at the crime scene and the .40 caliber shell casings found at the defendant’s father’s house, where the defendant lived, were fired from the same weapon.
The defense relied on the alibi testimony provided by the defendant’s sister and tried to establish that the police did not fully investigate other suspects such as Dalando Garner. However, the trial court reasonably rejected such testimony. The defendant admitted that he was at the victims’ house on the night of the homicides, and there was no evidence linking Dalando to the homicides.
Considering the evidence in a light most favorable to the prosecution, the evidence was sufficient for the trial judge to conclude beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis of innocence, that the defendant was guilty of the second degree murders of 1 MMadonna Wachter and Stephen *887 Bryant. This assignment of error is without merit.
Next, Farris claims that the trial court erred in denying his motion to suppress. Prior to trial, the defense filed a motion to suppress the evidence obtained from the warrantless search of the victim, Madonna’s, cellphone. The defense relied on Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), Thompson v. Louisiana, 469 U.S. 17, 21, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984), and Flippo v. West Virginia, 528 U.S. 11, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999), for the proposi tion that there is no “crime scene exception” to the warrant requirement. Farris argues on appeal that the defendant has standing to challenge the warrantless search of the victim’s cellphone because he was “adversely affected” by the search under La. Const. Art. I, § 5. The defense claims that because there is no “crime scene exception” to the warrant requirement, the police were required to obtain a search warrant prior to opening the victim’s cellphone and examining its contents. There were no exigent circumstances, and Farris asserts the necessity of a search warrant.
The right of every person to be secure in his person, house, papers and effects against unreasonable searches and seizures is guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 5, of the 1974 Louisiana Constitution. It is well settled that a search and seizure conducted without a warrant issued on probable cause is per se unreasonable unless the warrantless search and seizure can be justified by one of the narrowly drawn exceptions to the warrant requirement. State v. Thompson, 02-0333 (La. 4/9/03), 842 So.2d 330; State v. Tatum, 466 So.2d 29 (La. 1985); State v. Ledford, 40,318 (La.App. 2 Cir. 10/28/05), 914 So.2d 1168.
When the legality of a search or seizure is placed at issue by a motion to suppress evidence, the state bears the burden of proving the admissibility of any evidence seized without a warrant. La. C.Cr.P. art. 703(D). Trial courts are vested with great discretion when ruling on a motion to suppress, and the ruling of a trial judge on the motion to suppress will not be disturbed absent an abuse of that discretion. State v. Coleman, 14-0402 (La. 2/26/16), 188 So.3d 174.
In Louisiana, “[a]ny person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.” La. Const. Art. I, § 5. Thus, “[tjhere is no equivalent under Louisiana constitutional law to the federal rule that one may not raise the violation of a third person’s constitutional rights.” State v. Jackson, 09-1983 (La. 7/6/10), 42 So.3d 368, citing State v. Owen, 453 So.2d 1202 (La. 1984). However, La. Const. Art. I, § 5, presupposes that “there must be an invasion of someone’s rights to privacy before there can be an unreasonable search,” State v. Perry, 502 So.2d 543 (La. 1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987). The test of when that intrusion occurs as a matter of the Louisiana Constitution is identical to the Fourth Amendment standard, i.e., the person must possess an objectively reasonable expectation of privacy in the area. Id. The test for determining whether one has a reasonable expectation of privacy is not only whether the person had an actual or subjective expectation of privacy, but also whether that expectation is of a type which society at large is prepared 116to recognize as being reasonable. State v. Jackson, supra; State v. Freeman, 50,282 (La.App. 2 Cir. 4/13/16), 194 So.3d 1.
*888 In Mincey v. Arizona, supra, the United States Supreme Court held a warrantless search is not permissible simply because a homicide has recently occurred on the premises. In rejecting a “murder scene exception,” the Court held that the defendant did not forfeit his expectation of privacy in his home where the shooting occurred, nor did his arrest lessen his right of privacy to justify the search of his home. See also, Thompson v. Louisiana, supra (warrantless search of the defendant’s home following murder and attempted suicide when police were summoned to the scene by the defendant’s daughter); Flippo v. West Virginia, supra (warrantless search of cabin where the defendant and his wife were vacationing).
In State v. Hudson, 15-0158 (La.App. 1 Cir. 9/18/15), 2015 WL 5516100, the court found that the defendant had no reasonable expectation of privacy in the deceased victims’ home. In addressing the defendant’s potential standing under La. Const. Art. I, § 5, the court found that there was no living person who had a privacy interest in the home, noting that there must be an invasion of someone’s rights to privacy before there can be an unreasonable search. Further, the court distinguished the Min-cey line of cases, noting that in those cases, the defendant’s home was searched. The court stated that the entry of the victims’ home was not in violation of any living person’s privacy interest, that exigent circumstances created the need to preserve evidence from destruction, and that the officers could seize evidence in plain view. See also, State v. Perry, supra (finding that the defendant had no standing to object to the warrantless search of his parents’ 117home, in which the murders occurred, noting that there was no living person who had a privacy interest in the home); State v. Revere, 572 So.2d 117 (La. App. 1st Cir. 1990), writ denied, 581 So.2d 703 (La. 1991).
At trial, Detective Mayfield testified that when he arrived at the crime scene, Madonna’s cellphone was located on the floor at her feet. He accessed the cellphone and determined the last calls Madonna made and received, and reviewed her contacts and text messages which he found to be threatening. This information led him to the defendant. Detective Mayfield admitted that he did not obtain a search warrant for Madonna’s cellphone.
The trial court did not abuse its discretion in denying the defendant’s motion to suppress the evidence obtained from Madonna’s cellphone. The cellphone was the personal property of Madonna.[3] The defendant had no possessory interest or reasonable expectation of privacy in the cellphone. Although the defendant relies on Mincey v. Arizona, supra, Thompson v. Louisiana, supra, and Flippo v. West Virginia, supra, those cases are distinguishable from the instant case. In those cases, the defendant’s home was searched. However, in the instant case, there was no living person who had a privacy interest in the cellphone.
Regarding the defendant’s standing under La. Const. Art. I, § 5, although the defendant was “adversely affected” by the search of Madonna’s cellphone, La. Const. Art. I, § 5 requires that there be an invasion of someone’s rights to privacy before there can be an unreasonable search. Because Madonna’s rights were not violated by the search of her cellphone, |isthe defendant does not have standing to challenge the search of the cellphone,
*889 The defense next argues that the defendant’s consecutive life sentences are excessive and that the trial court failed to provide sufficient justification for consecutive sentences. The defense claims that the reasons given by the court—the heinous nature of the crime, evidence of the victim attempting to tender money, and the disregard for human life—do not justify such extreme consecutive maximum sentences. The defense argues that the circumstances described by the court are characteristic of many murders and the court failed to address each offense.
As noted above, there is no indication that the trial court ever ruled on the defendant’s motion to reconsider sentence. However, the absence of a ruling on a motion to reconsider sentence does not affect this Court’s ability to consider the constitutional excessiveness of a defendant’s sentence on appeal, nor does it require a remand. The trial court retains jurisdiction to rule on the motion to reconsider sentence and the defendant is within his rights to provoke same. See La. C.Cr.P. Arts. 881.1(C) and 916(8). Should the trial court later rule upon the defendant’s motion to reconsider sentence, the defendant may seek appellate review of that decision pursuant to La. C.Cr.P. Art. 914(B)(2). State v. Jackson, 46,963 (La.App. 2 Cir. 2/29/12), 87 So.3d 174; State v. Lathan, 41,855 (La.App. 2 Cir. 2/28/07), 953 So.2d 890, writ denied, 07-0805 (La. 3/28/08), 978 So.2d 297. See, State v. Weathersby, 13-0258 (La. App. 4th Cir. 4/16/14), 140 So.3d 260 (finding that the failure of a trial court to rule on a motion to reconsider sentence requires that the case be remanded for a ruling, and that appellate review of | i9the defendant’s sentence be deferred); State v. Thomas, 43,783 (La.App. 2 Cir. 1/14/09), 2 So.3d 1181, writ denied, 10-0130 (La. 12/17/10), 51 So.3d 22; State v. Rose, 50,861 (La.App. 2 Cir. 9/28/16), 206 So.3d 1102, 2016 WL 5400446.
An appellate court utilizes a two-pronged test in reviewing a sentence for excessiveness. First, the record must show that the trial court took cognizance of the criteria set forth in La. C.Cr.P. Art. 894.1. Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. Art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La. 1993); State v. Smith, 49,839 (La.App. 2 Cir. 5/20/15), 166 So.3d 416, writ denied, 15-1244 (La. 6/3/16), 192 So.3d 753.
The mandatory sentence for second degree murder is punishment by life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B). The argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Parker, 416 So.2d 545 (La. 1982); State v. Smith, supra.
When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C.Cr.P. Art. 883. Concurrent sentences arising out of a single course of conduct are not mandatory, and consecutive |2nsentences under those circumstances are not necessarily excessive. State v. Hebert, 50,163 (La.App. 2 Cir. 11/18/15), 181 So.3d 795. It is within the court’s discretion to make sentences consecutive rather than concurrent. State v. Robinson, 49,677 (La.App. 2 Cir. 4/15/15), *890 163 So.3d 829, writ denied, 16-0924 (La. 4/15/16), 191 So.3d 1034.
A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence or record. When consecutive sentences are imposed, the court shall state the factors considered and its reasons for the consecutive terms. Among the factors to be considered are: (1) the defendant’s criminal history; (2) the gravity or dangerousness of the offense; (3) the viciousness of the crimes; (4) the harm done to the victims; (5) whether the defendant constitutes an unusual risk of danger to the public; and (6) the potential for the defendant’s rehabilitation. However, the failure to articulate specific reasons for consecutive sentences does not require remand if the record provides an adequate factual basis to support consecutive sentences. State v. Robinson, supra.
Although the trial court has not yet ruled on the defendant’s motion to reconsider sentence, this Court may review the defendant’s sentences for constitutional ex-cessiveness. The trial court did not abuse its discretion in sentencing the defendant to two consecutive life sentences. At sentencing, the trial court stated that it considered the totality of the circumstances, the aggravating and mitigating factors in La. C.Cr.P. Art. 894.1, the heinous nature of the murders, the fact that there was evidence that the victim attempted to tender money to the person committing the crime, and the |¾1 disregard for human life. These were extremely violent crimes which resulted in the deaths of two people. The record adequately supports the imposition of consecutive sentences in this case.
Moreover, even if the trial court erred in imposing consecutive rather than concurrent sentences, the error was harmless in light of the fact that each life sentence was imposed without the benefit of parole, probation, or suspension of sentence. See State v. Wood, 08-1511 (La.App. 3 Cir. 6/3/09), 11 So.3d 701; State v. Petty, 12-278 (La. App. 5th Cir. 10/30/12), 103 So.3d 616.
The defendant’s consecutive life sentences are not excessive. When compared to the severity of the offenses, the defendant’s sentences are neither grossly disproportionate, nor shocking to the sense of justice. This assignment of error is without merit.
Next, in three pro se assignments of error, Farris raises various claims relating to the bill of indictment, including the trial court’s denial of a motion to quash.
In response, the state argues that the defendant was properly charged with two counts of second degree murder by a short form indictment, that the record indicates that the foreman signed the indictment, and that the indictment was filed on March 13, 2013. The state claims that its responses to discovery and the bill of particulars were sufficient to give the defendant notice of the charges against him. Also, the state notes that there is no indication that the trial court ruled on the pro se motions to quash, and therefore, the defendant has waived his right to object.
| ^Motions pending at the commencement of trial are waived when the defendant proceeds to trial without raising the issue that the motions were not ruled upon. State v. Holmes, 06-2988 (La. 12/2/08), 5 So.3d 42, cert. denied, 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009); State v. Winzer, 49,316 (La.App. 2 Cir. 10/8/14), 151 So.3d 135, writ denied, 14-2373 (La. 4/22/16), 191 So.3d 1044.
The bill of indictment was in proper form and the defendant was adequately informed of the nature of the charges *891 against him. Contrary to the defendant’s allegations, the indictment endorsed “a true bill” and signed by the foreman of the grand jury, and the minutes indicate that the “true bill was filed” on March 13, 2013. The indictment provides, in pertinent part:
on or about the 2nd day of January 2013, ... ROBERT CALVIN FARRIS committed the offense of SECOND DEGREE MURDER (2 counts) as defined by R.S. 14:30.1 in that he: COUNT 1: committed second degree murder of MADONNA DEAN WACHTER [and] COUNT 2: committed second degree murder of STEPHEN BRYANT.
The indictment complied with the short form provided in La. C.Cr.P. Art. 465(A)(32), and the state provided the defendant with ample discovery and adequately responded to the defendant’s request for a bill of particulars. Further, there is no indication that the trial court ever ruled on the defendant’s motions to quash. Because the defendant failed to object to the trial court’s failure to rule on his motions, the defendant has waived this claim. This assignment of error is without merit.
The defendant next claims in a pro se assignment of error that the trial judge’s finding of guilt establishes that the judge was biased. The judge incorrectly stated that an eyewitness identified the defendant at the crime scene outside the house and rejected the testimony regarding the defendant’s |2Salibi. These rulings indicate no bias, and the trial court’s misstatement was harmless error.
A trial judge is presumed to be impartial, and the burden is on the defendant to prove otherwise. In order to obtain a recusation based on bias, prejudice, and personal interest, the party seeking the recusation must establish grounds of a substantial nature based on more than conclusory allegations. State v. Brown, 46,669 (La.App. 2 Cir. 2/29/12), 86 So.3d 726, writ denied, 12-0724 (La. 9/14/12), 97 So.3d 1016. See also La. C.Cr.P. Art. 671; State v. Rollins, 32,686 (La.App. 2 Cir. 12/22/99), 749 So.2d 890, writ denied, 00-0549 (La. 9/15/00), 768 So.2d 1278 (defendant’s assertions that several evidentiary rulings showed the trial judge’s inability to conduct a fair and impartial trial did not set forth valid grounds for recusal, where defendant failed to point to specific facts as to why rulings were grounds for recusal and presented no evidence that rulings were anything other than ordinary eviden-tiary rulings); Brown v. Brown, 39,060 (La.App. 2 Cir. 7/21/04), 877 So.2d 1228 (“adverse rulings, alone, do not show bias or prejudice requiring recusal”).
As discussed above, the evidence was sufficient to support the defendant’s convictions for second degree murder. The defendant failed to prove that the trial judge was biased, and this assignment of error is without merit.
In his next pro se assignment of error, Farris challenges the state’s expert witness testimony regarding the gun casings. Carla White was offered by the state as an expert in firearms identification. Defense counsel objected to White’s qualifications, claiming that she had never been [^qualified as an expert in the specific area of tool mark identification. Considering White’s testimony that firearms identification is a subdivision of tool mark identification, along with her knowledge, experience and education, the trial court accepted White as an expert in firearms identification.
The defendant now argues again that the trial court erred in allowing White to testify because she was not a tool mark expert. He claims that White did not “show any of her findings” and that she would have needed the gun to analyze the *892 bullets and casings. In response, the state contends that White was properly allowed to testify as a firearms expert as she stated that firearm analysis is a part of tool mark analysis, and that the defendant’s argument relates to the weight and credibility of White’s testimony.
Under La. C.E. Art. 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (1) the expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case.
Trial courts are vested with great discretion in determining the competence of an expert witness, and rulings on the qualification of a witness as an expert will not be disturbed unless there was a clear abuse of that discretion. State v. Tucker, 49,950 (La.App. 2 Cir. 7/8/15), 170 So.3d 394; State v. Higgins, 03-1980 (La. 4/1/05), 898 So.2d 1219, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).
The trial court did not abuse its discretion in accepting White as an expert in firearms identification. White testified about her education and experience and stated that she has qualified as an expert in firearms identification in Caddo, Bossier and Sabine Parishes and in federal court. Although she has never qualified as an expert in tool mark identification, she testified that firearms identification is a subset of tool mark identification. Further, White’s certified report was introduced into evidence at trial. White explained how she compared the shell casings and the bullets and testified that she did not need the gun in order to determine that all four casings were fired from the same gun. This assignment of error is without merit.
Finally, the defendant claims that the court reporter failed to record the entire trial proceedings. This argument is based on the fact that in providing reasons for the verdict, the trial judge stated that the defendant was identified by an eyewitness who saw him yelling outside the victims’ home, when no such testimony is included in the record. An eyewitness did testify to seeing an unidentified black man outside the home on the evening of January 2.
La. Const. Art. I, § 19 guarantees defendants a right of appeal “based upon a complete record of all the evidence upon which the judgment is based.” In felony cases, the clerk of court or court stenographer shall record all proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, |2fiand objections, questions, statements and arguments of counsel. La. C.Cr.P. Art. 843.
The defendant failed to show that portions of the trial were not transcribed by the court reporter. The fact that the trial judge incorrectly noted that an eyewitness identified the defendant is not proof of missing trial testimony. This assignment of error is without merit.
Conclusion
For the foregoing reasons, the defendant’s convictions and sentences are affirmed.
AFFIRMED.

. There is no indication that the trial court ruled on the motion.

. Diane Stokes Farris, Farris’s mother, confirmed that Farris and Dalando Garner both used John Farris’s cellphone.

. Although the cellphone was subscribed to LaRonda Carter, Madonna's sister, LaRonda gave the cellphone to Madonna for her use, and therefore, it appears that LaRonda did not have any privacy interest in the cellphone.