BROWN, C.J.
Defendant, Johnny Lee Young, Jr., was charged with the forcible rape ( La. R.S. 14:43 ) of K.C. that occurred on September 7, 2014. At arraignment, Young pled not guilty. Several pretrial motions were filed, including a pro se motion to suppress certain text messages and a phone call recording between defendant and K.C. That same day, the trial court granted defendant's oral motion to represent himself with standby counsel. The trial court denied defendant's motion to suppress after a hearing on December 1, 2015.
After a jury trial, Young was found guilty of the responsive verdict of attempted simple rape ( La. R.S. 14:43, 14:27 ). Defendant was adjudicated a second-felony habitual offender and sentenced to 30 years at hard labor without the benefit of probation, parole, or suspension of sentence. The trial court additionally ordered defendant to pay court costs, or in lieu of payment, serve 90 days in the parish jail, to run concurrently with any other sentence. Defendant filed a motion to reconsider sentence, which was denied. On appeal, Young challenges the excessive nature of his sentence. Defendant also filed a pro se brief challenging the sufficiency of the evidence, certain alleged Fourth Amendment violations, and admission at trial of certain text messages sent by defendant to K.C. and a recorded phone conversation between defendant and K.C. We affirm the conviction and sentence.
FACTS/PROCEDURAL HISTORY
At trial, the state called six witnesses. Shreveport Police Officer Darrion Jackson *356 testified that at 6:00 p.m. on September 7, 2014, he was dispatched to an apartment complex located at 2420 Leslie Street in Shreveport, Louisiana, in response to a report of an alleged rape. Upon arriving at the complex, Officer Jackson made contact with the victim, who appeared very distraught, was shaking, and kept fumbling with the tissues in her hand. She attempted to explain to Officer Jackson what happened but couldn't stop crying. Eventually, K.C. disclosed to Officer Jackson that the rape had occurred the previous night, after she attended a party at her upstairs neighbor's apartment. She stated that she consumed alcohol at the party, returned to her own apartment, and went to bed. Between 12:30 a.m. and 1:00 a.m. on September 7, 2014, she was wakened by defendant, who was lying on top of her. K.C. was weak from the alcohol and asked defendant how he got in the apartment. Defendant's response was, "[d]on't worry about it." The victim told Officer Jackson that she yelled for her oldest son, who was in the apartment with her two other children, but Young got off of her and locked her bedroom door. K.C. attempted to stand and leave the room, but defendant grabbed her arm and threw her back onto the bed and proceeded to vaginally rape her. K.C. identified her rapist as Young, a former boyfriend.
Officer Jackson contacted detectives with the Shreveport Police Department's sex crimes division and brought K.C. to Willis-Knighton Hospital for a rape kit to be collected. Officer Jackson further testified that he collected as evidence K.C.'s underwear, which she was wearing prior to the attack, as well as her robe and white top.[1] The case was then taken over by detectives with the sex crimes division, concluding Officer Jackson's involvement in the matter.[2]
Michael Jones of the sex crimes division testified that he was the investigating detective in the instant case. He first made contact with K.C. at the hospital while she was being examined. Like Officer Jackson, Detective Jones observed that the victim was crying, lying in the fetal position on the hospital bed, and visibly shaking. K.C. related to Det. Jones what she had previously told Officer Jackson
A Sexual Assault Nurse Examiner ("SANE"), Melanie Hubbard, was called to the hospital to collect and obtain the rape kit, or Personal Evidence Recovery Kit ("PERK"), which consisted of collecting DNA samples and documenting K.C.'s physical condition. Det. Jones testified that Ms. Hubbard gave him the PERK kit, and he delivered the kit to the crime lab for analysis. According to Det. Jones, the crime lab analysis found no DNA in the samples recovered from K.C.
Det. Jones testified that on September 8, 2014, he took K.C.'s children, a 14-year-old daughter and two younger sons, to be interviewed by a trained forensic interviewer at the Gingerbread House; he monitored the interview through a closed-circuit television system. A videotape of the interview was admitted into evidence.
In the interview, K.C.'s teenage daughter stated that, on the night in question, her mother returned from the party and went to bed. The teen recalled later hearing *357 a knock at the door, which her 8-year-old brother answered, admitting defendant into the apartment. The daughter stated that she was in her room when defendant entered the apartment, but a few minutes later, defendant knocked on her bedroom door and told her that her mother wanted to borrow her fan. She brought the fan to her mother's bedroom and left. Defendant then shut the bedroom door behind her. About 10 minutes later, her mother came out of her room, crying. The daughter noted that defendant had already left. The teenager identified defendant as the "man who cuts her brothers' hair," and noted that he used to spend the night. The two sons were also interviewed; however, they were unable to provide additional information.
K.C. informed Det. Jones that defendant had attempted to contact her by phone, and Det. Jones testified that he advised K.C. to text Young and inform him that she was upset and ask him why he raped her. K.C. communicated with defendant via text message, then provided a copy of the messages to Det. Jones.[3] Det. Jones testified that he also advised K.C. to speak to defendant and record the conversation. K.C. initiated the telephone call, which lasted approximately nine minutes.[4] During the call, defendant offered to pay for K.C.'s counseling and stated, "[K.C.], I'm sorry for raping you." After the call, Det. Jones obtained an arrest warrant and arrested defendant.
Melanie Hubbard,[5] the nurse who performed the PERK exam on K.C., testified that she examined the victim at 8:00 p.m. on September 7, 2014, approximately 21 hours after the alleged rape occurred. Ms. Hubbard testified that evidence, such as DNA samples, can be lost if the victim is not examined immediately after a rape. Ms. Hubbard stated that K.C. had urinated several times since the incident and was also on her menstrual cycle, which can explain why no DNA was found on the samples taken during the exam. Ms. Hubbard also noted that although no bruising was found on K.C.'s body during the examination, this was not uncommon in rape cases.
K.C. testified that she was sexually abused as a child and suffered from bipolar disorder. K.C. stated that after graduating from high school, she became a paralegal, but had difficulty holding a job because of her bipolar disorder. During this time, K.C. was diagnosed with fibromyalgia, which is a condition in the nervous system that causes widespread pain. K.C. stated that she began drinking and smoking marijuana, and attempted suicide several times. K.C. testified that she and her three children moved to Shreveport to live with her father, and it was in Shreveport that K.C. was diagnosed with bipolar disorder and began receiving treatment. Around this time, K.C. developed a casual sexual relationship with Young, who cut her children's hair. The relationship lasted two years and ended in May of 2014, several months prior to the incident.
K.C. testified that on the night of September 6, 2014, she attended her neighbor's *358 party and had a couple of alcoholic beverages. During the party, K.C. became tired and returned to her apartment. She put on a black nightgown and took a sleeping pill. K.C. stated that her sons were watching television in her bedroom, and her daughter was in her own room. After she took the pill, K.C. fell asleep with her sons still in her bedroom. K.C. testified that sometime later, she woke up and felt something very heavy on her; it was Young. As K.C. attempted to push Young away, she realized that her youngest son was still in her bedroom because she heard Young instruct the young boy to leave the room. K.C. stated that she instinctively called out for her daughter, but then feared that Young might hurt her daughter too if she attempted to help her, so K.C. lied and stated that she was hot and needed a fan. K.C. heard her daughter bring the fan to K.C.'s bedroom. Young took the fan from her daughter, who went back to her own room, and locked the bedroom door. K.C. tried to get off the bed, but Young pushed her back down and vaginally raped her. K.C. recalled Young leaving shortly afterward, and she passed out until the next morning.
K.C. testified that the morning after the rape, she woke up to find her underwear on the floor. She put on clean panties and sat at the picnic table in front of her apartment. K.C. stated that she kept calling the police department and hanging up until her neighbor, Sheva, came to check on her at 4:30 p.m. At that time, K.C. told Sheva that Young had raped her. K.C. stated that she also spoke to her other neighbor, Caroline Young, who told K.C. to call the police.
K.C. testified that Young called her repeatedly after the incident, and after she informed Det. Jones of the calls, he instructed her to text and call Young. K.C. testified that the number she called was the same number she had used to contact Young while they were dating, and she recognized Young's voice during the recorded phone call.
Caroline Young testified that she lives in the same apartment complex as K.C. and confirmed that she was the one who instructed K.C. to call the police.[6]
Joseph Jones, M.D., testified that he has been treating K.C. for fibromyalgia and osteoarthritis since May of 2014. Dr. Jones stated that he prescribed K.C. several medications, including sleeping pills, as part of her treatment. K.C. had an appointment with Dr. Jones on September 11, 2014, and informed him that she had recently been sexually assaulted. Dr. Jones noted that on previous visits, K.C. had appeared "very bubbly," but on this occasion, K.C. was withdrawn and anxious. At the appointment, K.C. complained of severe nightmares and reliving events, so Dr. Jones recommended counseling and noted that K.C. presented symptoms of post-traumatic stress disorder, which she had not displayed prior to the incident.
Following Dr. Jones' testimony, the state rested. The defense did not call any witnesses and also rested. After deliberation, the jury found Young guilty of the responsive verdict of attempted simple rape. That same day, the state filed a second-felony habitual offender bill. On August 9, 2016, Young filed a motion for post-verdict judgment of acquittal, which was denied. Young was adjudicated a second-felony habitual offender and, on January 31, 2017, he was sentenced to 30 years at hard labor without the benefit of probation, parole, or suspension of sentence. The trial court also ordered Young to pay *359 court costs or, in default thereof, serve 90 days in the parish jail.
On February 2, 2017, Young filed a motion to reconsider sentence, which was denied by the trial court on February 3, 2017.
The instant appeal followed.
DISCUSSION
As both assignments of error challenge the credibility of the evidence as well as its sufficiency, they are addressed together. Young urges that the evidence against him is fabricated, and the jury erred in finding K.C., a woman suffering from severe bipolar and anxiety disorders, to be a credible witness. Young also argues that the conflicting statements from K.C.'s children in their Gingerbread House interviews create reasonable doubt as to the identity of the victim's attacker.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 05/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Carter , 42,894 (La. App. 2 Cir. 01/9/08), 974 So.2d 181, writ denied , 08-0499 (La. 11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 02/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2 Cir. 01/14/09), 1 So.3d 833, writ denied , 09-0310 (La. 11/06/09), 21 So.3d 297.
The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Demery , 49,732 (La. App. 2 Cir. 05/20/15), 165 So.3d 1175, writ denied , 15-1072 (La. 10/17/16), 207 So.3d 1067. A reviewing court may not impinge on the fact finder's discretion unless it is necessary to guarantee the fundamental due process of law. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000) ; State v. Demery, supra.
At the time of the offense, La. R.S. 14:43 provided, in pertinent part:
(A). Simple rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:
(1) When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim's incapacity.
Additionally, La. R.S. 14:27(A) provided:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly towards the accomplishing of his object is guilty of attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
There is sufficient evidence to support Young's conviction of attempted simple rape. The state was required to prove beyond a reasonable doubt that Young attempted to have sexual intercourse with K.C. without her consent while she was incapable of resisting due to intoxication.
*360 Young clearly stated during his recorded phone conversation with K.C. that he was sorry for raping her, and he would pay for her to receive counseling. Young's identity as K.C.'s rapist is corroborated by K.C.'s own testimony and her daughter's Gingerbread House interview, both identifying Young as the man who came to their apartment.
The testimony also demonstrated that K.C. consumed at least 1½ alcoholic beverages at the party, became tipsy, and compounded her intoxicated state by taking a prescribed sleeping pill before going to bed. Due to her consumption of alcohol and the sleeping pill, K.C. was unable to effectively resist Young. K.C.'s testimony further established that the sexual intercourse was without her consent, and all of the witnesses testified that after the incident, K.C. was in a heightened emotional state and appeared to have suffered some emotional trauma. Although the PERK test ultimately did not reveal DNA evidence or bruising, Ms. Hubbard testified that the amount of time that passed between the assault and the examination, 21 hours, coupled with K.C. using the restroom several times, likely contributed to a lack of DNA evidence being found on the samples taken from the exam. Ms. Hubbard further noted that a lack of bruising is not uncommon in sexual assault cases.
The jury's verdict of guilty of the responsive charge of attempted simple rape is supported by the evidence. Additionally, Young's allegations of fabricated evidence are unsubstantiated. As the jury's decision was reasonably based on a credibility call, it will not be disturbed on appeal. These assignments lack merit.
Young also argues that the trial court erred in admitting into evidence text messages he sent to K.C., as well as a recorded telephone conversation between himself and K.C.[7] According to defendant, the police coerced K.C. into entrapping defendant by soliciting a confession, thereby violating his Fourth Amendment right against unlawful searches and seizures and the Louisiana Electronic Surveillance Act. La. R.S. 15:1301, et seq.
Motion to Suppress
The right of every person to be secure in his person, house, papers and effects against unreasonable searches and seizures is guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 5 of the 1974 Louisiana Constitution. It is well settled that a search and seizure conducted without a warrant issued on probable cause is per se unreasonable unless the warrantless search and seizure can be justified by one of the narrowly drawn exceptions to the warrant requirement. State v. Thompson , 02-0333 (La. 04/09/03), 842 So.2d 330 ; State v. Tatum , 466 So.2d 29 (La. 1985) ; State v. Ledford , 40,318 (La. App. 2 Cir. 10/28/05), 914 So.2d 1168.
When the legality of a search or seizure is placed at issue by a motion to suppress evidence, the state bears the burden of proving the admissibility of any evidence seized without a warrant.
*361 La. C. Cr. P. art. 703(D). Trial courts are vested with great discretion when ruling on a motion to suppress, and the ruling of a trial judge on the motion to suppress will not be disturbed absent an abuse of that discretion. State v. K.C. , 14-0402 (La. 02/26/16), 188 So.3d 174, cert. denied , --- U.S. ----, 137 S.Ct. 153, 196 L.Ed.2d 116 (2016).
In Louisiana, "[a]ny person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court." La. Const. art. I, § 5. Thus, "[t]here is no equivalent under Louisiana constitutional law to the federal rule that one may not raise the violation of a third person's constitutional rights." State v. Jackson , 09-1983 (La. 07/06/10), 42 So.3d 368, citing State v. Owen , 453 So.2d 1202 (La. 1984). However, La. Const. art. I, § 5 presupposes that "there must be an invasion of someone's rights to privacy before there can be an unreasonable search." State v. Perry , 502 So.2d 543 (La. 1986), cert. denied , 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987). The test of when that intrusion occurs as a matter of the Louisiana Constitution is identical to the Fourth Amendment standard, i.e., the person must possess an objectively reasonable expectation of privacy in the area. Id. The test for determining whether one has a reasonable expectation of privacy is not only whether the person had an actual or subjective expectation of privacy, but also whether that expectation is of a type which society at large is prepared to recognize as being reasonable. State v. Jackson, supra ; State v. Freeman , 50,282 (La. App. 2 Cir. 04/13/16), 194 So.3d 1, writ denied , 16-0927 (La. 05/01/17), 220 So.3d 743.
Electronic Surveillance
It is well settled in Louisiana that the use of electronic surveillance equipment to secretly record a conversation with the consent of one of the parties to the conversation does not "invade the privacy" of the parties in the conversation within the meaning of both the state and federal constitutions, and therefore the warrant requirement does not attach. La. R.S. 15:1301, et seq. ; State v. Caldwell , 616 So.2d 713 (La. App. 3 Cir. 1993), writ granted on other grounds, cause remanded , 620 So.2d 859 (La. 1993), citing State v. Reeves , 427 So.2d 403 (La. 1982) ; State v. Marks , 503 So.2d 32 (La. App. 1 Cir. 1986), writ denied , 506 So.2d 110 (La. 1987) ; State v. Serigny , 481 So.2d 659 (La. App. 1 Cir. 1985), writ denied , 484 So.2d 667 (La. 1986).
State v. Reeves, supra , is the seminal case on electronic surveillance wherein the Louisiana Supreme Court determined that warrantless recording of a conversation to which one party consents does not invade the subject's privacy in violation of La. Const. art. I, § 5. The supreme court explained:
Society seeks to foster truth, not to suppress it. The presence of the electronic transmitter has but one effect. Instead of the informant committing the conversation to memory, a machine tapes each and every sentence of the communication. The machine notes the inflection of the voices and the context in which remarks are made. If the defendant speaks innocently, his own words will exculpate him. However, if he implicates himself, the recordings prevent him from denying his participation in the conversation. Surely, society would not consider reasonable an expectation of privacy which would result in a more inaccurate version of the events in question.
State v. Reeves, 427 So.2d at 418. Reeves involved a private person working for the government who recorded a conversation (audio only) with a co-worker.
*362 In State v. Farris, 51,094 (La. App. 2 Cir. 12/14/16), 210 So.3d 877, writ denied , 17-0070 (La. 10/09/17), 227 So.3d 828, this Court extended State v. Reeves, supra, and found that a defendant has no reasonable expectation of privacy as to a murder victim's cell phone; therefore, there was no invasion of the defendant's privacy when the police officer conducted a warrantless search of the victim's cell phone and discovered threatening text messages sent to the victim from the defendant.
Excessive Sentence
Young argues that his sentence is unconstitutionally excessive as he only has one prior felony, he did not use a dangerous weapon during the commission of the offense, and he did not threaten K.C. with harm. According to defendant, his 30-year at hard labor sentence, is tantamount to a life sentence as he will not be eligible for parole until he is 74 years old. Defendant also argues that his previous conviction of indecent behavior with a juvenile, wherein he pled guilty for sending lewd and lascivious letters to a juvenile in state detention, is an atypical circumstance, as he never touched the juvenile and this conviction should not be held against him. Finally, defendant argues that he has rehabilitative potential as he previously served nine years in the military and received an honorable discharge.
The district court is granted wide discretion when imposing a sentence within the minimum and maximum limits allowed by the statute; therefore, a sentence will not be set aside as excessive unless the defendant shows that the district court abused its discretion. State v. Young , 46,575 (La. App. 2 Cir. 09/21/11), 73 So.3d 473, writ denied , 11-2304 (La. 03/09/12), 84 So.3d 550 ; State v. Hardy , 39,233 (La. App. 2 Cir. 01/26/05), 892 So.2d 710. A district judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, consequently, is given broad discretion in sentencing. State v. Zeigler , 42,661 (La. App. 2 Cir. 10/24/07), 968 So.2d 875. The reviewing court does not determine whether another sentence would have been more appropriate, but whether the district court abused its discretion. State v. Esque , 46,515 (La. App. 2 Cir. 09/21/11), 73 So.3d 1021, writ denied , 11-2347 (La. 03/09/12), 84 So.3d 551.
A defendant adjudicated a second-felony habitual offender, whose second felony and prior felony are sex offenses as defined by La. R.S. 15:541, shall be imprisoned at hard labor for a determinate term of not less than two-thirds of the longest possible sentence for the conviction and not more than three times the longest possible sentence prescribed for a first conviction, without the benefit of probation, parole, or suspension of sentence. La. R.S. 15:529.1(A)(2)(a). At the time of Young's offense, the punishment for attempted simple rape was not more than 12½ years imprisonment, with or without hard labor, and without the benefit of probation, parole, or suspension of sentence. Therefore, in accordance with La. R.S. 15:529.1, as a second-felony habitual offender, with both felonies being sex offenses, defendant faced a minimum sentence of 8¼ years and maximum sentence of 37½ years at hard labor, without the benefit of probation, parole, and suspension of sentence.
As a second-felony habitual offender, defendant's sentence of 30 years at hard labor, imposed without the benefit of probation, parole, or suspension of sentence, is not excessive. Prior to sentencing defendant, the trial court took into consideration his previous conviction for indecent behavior with a juvenile, his new charge of forcible rape was a crime of violence, and the fact that defendant was on felony probation as the time of the instant offense.
*363 The trial court also examined defendant's knowledge of K.C.'s sexual abuse as a child, and defendant's statement to the court, detailing mitigating circumstances.
While defendant did not threaten K.C. with a dangerous weapon, he still assaulted her in her home where her children were present. He was also aware of her history of having been sexually abused as a child and having made multiple suicide attempts, and he ignored them for his own purposes. In the recorded phone call between defendant and K.C., Young initially appeared to show remorse for his actions, but negated this by abruptly telling K.C. that he had to finish repairing a car and would talk to her later. Defendant's behavior demonstrates a reckless disregard for the feelings of others, and as such, his sentence does not shock the conscience.
Lastly, as noted by the state, defendant's argument that the trial court erroneously considered his prior conviction is without merit. Prior to attacking K.C., defendant wrote sexually graphic letters to a juvenile in a detention facility and subsequently pled guilty to indecent behavior with a juvenile. Defendant's argument essentially asks this Court to discount his prior conviction when considering the fairness of his current sentence because "it was not as bad as it could have been." This Court will not reward criminal behavior and sanction a more lenient sentence on the grounds that the crime could always have been worse. Furthermore, it would negate the entire purpose of sentencing defendant as a habitual offender if the trial court did not consider his underlying felony.
Because the sentence imposed by the trial court is well within the proper range and does not shock the sense of justice, this assignment is without merit.[8]
CONCLUSION
For the foregoing reasons, defendant's conviction and sentence are affirmed.

Page 297 of the record states that Officer Jackson collected a "white top"; however, during cross-examination, Officer Jackson refers to a "white towel" and a "black night gown," not a "robe."

On cross-examination, Officer Jackson also stated that a Sergeant Hill was one of the investigating officers at the crime scene; Sgt. Hill took photos of a brown top bed sheet, a red bottom bed sheet, and noted that the victim's underwear and night gown were located in the laundry hamper.

Det. Jones noted that K.C. sent the text messages with her daughter's phone as her own phone was not working. During Det. Jones' testimony, photographs of the text messages, State's Exhibits Nos. 2 through 10, were admitted into evidence and published to the jury. Defendant did not object to the admission of these text messages into evidence. In the text messages he sent, defendant never denied raping K.C. and apologized for his actions.

A recording of the phone call, State's Exhibit No. 11, was admitted into evidence without objection.

Hubbard was accepted as an expert in the field of sexual assault evidence collection.

It is unclear from the record whether Caroline is Young's mother. Ms. Young refers to him as "my boy" once; however, she never stated that he was her son.

Young's appellate counsel originally included the trial court's denial of Young's September 29, 2015, pro se motion to suppress as an assignment of error. Counsel stated:
Counsel for Mr. Young does not desire to abandon argument on this issue at this time. However, the transcript of the hearing on this motion has not been included in the record on appeal. A motion to supplement the record has been filed in this matter and a motion for leave of court to supplement the brief after a review of the transcript accompanies this brief.
A transcript of the hearing was supplemented to the record, but on August 18, 2017, counsel filed a letter with this Court, stating she will no longer be filing a supplemental brief addressing the motion to suppress claim.

The trial court ordered defendant to pay court costs or serve 90 days in the parish jail which was to run concurrently with any other sentence. Thus, this issue is moot.